## ATTORNEY GENERAL vs. OLD SOUTH SOCIETY IN BOSTON & others.

A gift for the poor of a particular church is a good public charity.

A church fund arising principally from contributions on communion Sundays, during a period of one hundred and fifty years, will not be deemed to be held as a public charity, if only a small portion thereof was specially designated to be for the poor, and there is no clear evidence that the residue was intended to be so applied, and it reasonably appears that the portion so designated has been so applied.

If the officers of a religious society intermingle funds held by them upon distinct trusts, one of which is charitable, and another, although not strictly charitable, is in the nature of religious uses, and there is evidence by which the amount of each fund can be approximately ascertained, the charity will not for that reason be entitled to the whole amount; but the court will determine, with as much accuracy as possible, the amount now justly belonging to each fund.

Trustees of a charity may be required by a court of chancery to account for income which has been misapplied, for any length of time, without regard to the statute of limitations; but an application of such income, made in good faith, and continued for many years, will not be lightly disturbed, especially after the lapse of a considerable time.

A court of chancery will order a charitable fund to be paid to a corporation authorized by law to receive and hold it, without first prescribing a scheme for its application.

Where the officers of a religious society had intermingled charitable with other funds, and an information filed to redress the abuse was sustained in part, the court ordered the costs incurred in support of the information, taxed as between counsel and client, to be paid out of the fund of the charity, and that the defendants bear their own costs.

INFORMATION filed by the attorney general of the Commonwealth, at the relation of Joseph Ballard, charging that certain funds which should be in the hands of the ministers and deacons of the Old South Church in Boston, and which should be applied by them to the use of the poor of said church, were in the possession of the Old South Society in Boston, and were used by said society to defray its general and current expenses, and that the funds appropriated to public charity as aforesaid are in danger of being wholly misapplied and perverted, and praying for relief in equity.

The case was referred to Henry W. Paine, as special master who submitted to the court a report, of which the following are the material portions :

The master " was requested to ascertain ' the amount of the fund which in law and justice should be in the hands of the ministers and deacons of the Old South Church in Boston, to be applied by them to the use of the poor of the church; ' and

this is the only matter pertinent to the issues raised by the bill and answers, to which his attention has been directed.

. " The evidence introduced consisted principally of records and account books of the Old South Church, some of which dated back to the early part of the last century. The first statement of the fund claimed as a poor fund appears in one of these books, entitled, 'South Church Booke, Sacramental Contrabutions, 1708.' This statement is found under date of 1761, and is headed ' Stock belonging to South Church in Boston at interest.' A fuller and more exact statement is, however, given in the same book, under date of January 1, 1766, and as after this, though an account of the fund, as a whole, has been regularly kept down to the present day, there is no other authentic statement of the fund, distinguishing the several sources from which it arose, or the relative proportions belonging to each division, it becomes important to examine this statement carefully.

" It is as follows :

" ' Rise and increase of the church stock is as follows :

|  |  |  | £ | s. | d. |
|---|---|---|---|---|---|
| 1. Rev. Mr. Pemberton, | legacy, | . . | 17 | 7 | 9 |
| 2. Mr. Cunningham, | " | . . . | 66 | 13 | 4 |
| 3. Mrs. Mills, | " | . . | 100 | 19 | 10 |
| 4. Mrs. Eliza Loring, | " | . . . | 13 | 6 | 8 |
| 5. Capt. Jona. Armitage, | " | . . | 13 | 6 | 8 |
| 6. Mr. Farr Tollman, | " | . . . | 40 | 0 | 0 |
| 7. Daniel Henchman, | " | . . | 66 | 0 | 0 |
| 8. Mr. John Simpson, | " | . . . | 30 | 0 | 0 |
| 9. Mrs. Mary Ireland, | " | . . | 133 | 6 | 8 |
| 10. Rev. Dr. Sewall, gift, | | . . . | 20 | 0 | 0 |

501 0 11

| 11. Pious and Charitable Fund, . | . . | 63 | 12 | 6¼ |
|---|---|---|---|---|
| 12. Ministers' Widows, . | . . . | 3 | 6 | 8 |

66 19 2¼

| 13. Sacramental Stock, . | . . . | 186 | 19 | 5¼ |
|---|---|---|---|---|
| 14. Interest received on the above, | . . | 119 | 14 | 8½ |

306 14 1¾

£874 14 3 ' "

The report then showed in detail that the first item was given

for the poor of the town of Boston, the second " unto the poor of the aforesaid meeting-house, *i. e.* the church and congregation," the third, fourth, fifth, seventh and ninth to the ministers and deacons, to pay the interest in their discretion to the poor of the church, and the sixth, eighth and tenth to the deacons, to be distributed yearly to the poor of the church ; and proceeded thus :

" It appears by the church records that, at a meeting of the church and congregation in 1738, it was proposed ' that some part of the money, which is or may be collected for charitable and pious uses, should, as we shall find ourselves able from time to time, be made a stated fund ; the income of it to be improved for such uses as the brethren of the church and congregation shall from time to time determine ; ' that a committee was raised to consider and report upon this proposal, and also upon another proposal, viz., ' to establish a fund for the support of the widows and fatherless children of the pastors of the said South Church from time to time ; ' that the committee made a report recommending the establishment of such fund, and the mode and manner of perpetuating it; that ' said report was read, voted, and established accordingly by the church and congregation.'

" This report recommended that the pastors and deacons shall, from time to time, be the trustees to manage said fund ; that the principal stock shall be kept entire, without being broken in upon on any occasion; that it shall be kept at interest, or laid out in real estate, or lent to the church for the improvement of the real estate of the church; and that the money shall always be specified in gold or silver, and, when loaned to individuals, neither the borrower nor either of his two sureties shall be of the church or congregation.

" Not long after this vote was passed a fund was set apart called the ' Pious and Charitable Fund ; ' and another, and smaller one, for the use of the widows and fatherless children of the pastors.

" These two funds, thus created and appearing in the foregoing statement, are not afterwards to be found, though there are in said book several statements of church stock. They do no

appear to have been kept distinct from the other funds in the hands of the ministers and deacons, as was recommended by the committee and ordered by the vote, but were mingled with them; and the presumption is strong that the brethren of the church and congregation, who were to control the fund, had directed its application to the same uses for which the greater part of the fund was held, though no vote authorizing such application is to be found.

"Thomas Hubbard, by his will, (proved 23d July, 1773,) gave 'to the charitable and pious fund of the Old South Church, so called, in Boston, fifty pounds;' and it appears by the aforesaid book (page 85), that this sum was received from the executors of Mr. Hubbard's will, in August 1773, and mingled with the general fund.

"The item denominated 'Sacramental Stock' is the one which raises questions of the greatest difficulty. The history of this stock may be traced back to the year 1708. The opening entry in the aforesaid book is as follows: 'July 12, 1708. By the last account for the balance brought from the old book, folio 23; viz: £95 8s. 5d.' This amount was in old tenor. This account is continued regularly from July 12, 1708, down to the year 1789. The other credits in this account are sacramental contributions, sums received for the use of the palls, and sums bequeathed for the use of the poor and not required to be put at interest. Of the sacramental contributions, it appeared that, from time to time, certain portions, at the time of their contribution, were specially designated to be for the poor, or for some poor person named; but the great mass was made without any special appropriation. On the other side are debited moneys expended for the communion service; expenses incurred by delegates to ordinations and councils; moneys paid to procure and keep in repair the palls; moneys paid for the expenses of conventions of ministers of the neighborhood at the pastor's; and moneys disbursed to the poor. Much the larger portion of the receipts was from the sacramental contributions, or moneys taken up on communion Sundays, and much the larger part of the disbursements was for the use of the poor.

"The balance of this account gradually increased till 1761,

when the larger part of it was invested in a treasury note for £134 lawful money. This note is not afterwards in any way included or mentioned in the sacramental account, but appears in the above mentioned statement of 1761, and with several other small balances that were transferred from the sacramental to the general account, between 1761 and 1766, forms the thirteenth item in the foregoing statement; viz., £186 19*s.* 5¼*d.*

" From 1766 to 1789, the date of the latest sacramental account that has been brought to the knowledge of the master, a balance was almost every year transferred from that account to the general fund, called the Church Stock; and from 1789 down to the time of the discontinuance of the sacramental collections, in 1849, in the account of the general fund there is annually, with but few exceptions, a credit to that fund of a balance of sacramental collections transferred.

" The general character of the items in the sacramental account has been already stated. The following items of an exceptional character also appear:

" ' July, 1708. Paid for catechizing, . . . . £1 10 0
" ' March, 1771. Paid Rev. Mr. Prentiss for board and sundry charges on the sickness and death of Dea. Sewall, as per account, . . . . . . . 9 13 6
" ' Dec. 1771. Paid Rev. John Walley for taking catalogue of the library of the late Rev. Doct. Sewall, as per his account, the greatest part of 17 days, . . . 30 12 0
" ' Sept. 1764. 100*s.* appropriated expressly to the poor, given to sundries, . . . . . . . 5 0 0

" On the debit side of this account, under date of July 1749 is found this entry: ' To cash lent out of this stock, July 6, 1747, to pay off the deficiency of our ministers, as per vote of the church, £192.00.' It nowhere appears that this sum was ever refunded."

" In 1798, it appears by the records of the church and congregation that it was voted ' that the deacons be a committee to obtain an estimate of the expense of repairing the steeple and such other parts of the building as may be found necessary and to devise some plan for raising a sum sufficient for said

purpose;' that the committee reported, 'that the repairing of the steeple would cost fifteen hundred dollars, and that it would be proper to open a subscription in the society for raising this money,' and that it was voted ' to open a subscription.'

" It appears by the records of the church, that, at a regular church meeting in 1849, it was voted to discontinue the collections on communion Sundays, ' after remarks from Deacons Cutler, Stoddard and Dimon, showing that the omission of the custom of the church to take a collection at the close of the communion season, for the benefit of the poor of the church, would not, in the present circumstances of the Old South, in any degree hurt the interests of the poor.' This record purports to be signed by the clerk, who was also at that time the sole pastor.

" The general fund, entered on the books as Church Stock, was increased by legacies for the use of the poor, by balances of sacramental collections, and by accumulations of interest. This fund was invested in bonds and stocks, which, at their par value in 1800, amounted to $16,062.71.

" On April 3, 1800, a committee appointed to take into consideration the propriety and right of building a number of stores on the land belonging to the society adjoining the meeting-house, reported that it was expedient to erect five brick stores ; and recommended borrowing of the society for the purpose, they being of opinion that, after paying the same interest upon the sum borrowed as it was then producing, there would be a surplus of rents which might be applied towards the support of an additional minister, ' providing the society should choose to expend it in that way,' ' in doing which,' they say, ' the views of the donor not only of the land, but those who have left legacies from time to time, will be fully answered, as the poor of said society will have as much as they now receive, and the other will be laid out in pious uses for the support of public worship.' This report was accepted.

" At the same meeting a committee was raised to examine into the society's funds, and to report the sums of money and their different appropriations. The following is the report of that committee, made to the church and congregation, April 22 :

" ' Your committee, appointed to examine into the state of the funds of the South Church and Congregation, to endeavor to find from what source they have arisen, and the intentions of the donors, have attended to that business, and beg leave to report that, on examining, they find them to have arisen as follows.

" ' Given by sundry persons for the poor of the church, to the care of the deacons of the church, . . £102 18 4

" ' Given by sundry persons for the poor of the church, to the care of the ministers and deacons of the church, . 153 6 8

" ' Given for the poor of the church and congregation, to the care of the ministers and deacons, . . . . . . . £5 12 0

" ' Given by Mrs. Mills, . . . . 100 19 10

" ' Given by Mr. Cunningham, . . . 66 13 4 — 173 5 2

" ' Collected at sundry times, the interest to the use of ministers' widows and children, . . . . . 66 19 2

" ' Given to the poor of the church, not mentioned to whose care . . . . . . . . . . 6 0 0

" ' Given, and not mentioned whether to the use of the church, or church and congregation . . . 8 0 4

" ' Collected from 1733 to May, 1757, for the use of the palls, 46 7 6

" ' Balances arising from the sacramental collections at different times to the year 1766, over and above what paid the expenses, . . . . . . . . 186 19 5

" ' We find by the church books, given by sundry persons, which we find no minutes in the papers for what use, but as they are in the church accounts, suppose for their use, 136 14 5

£880 11 0

" ' This was in possession in 1766 and at interest, and has been used ever since, the war coming on in about nine years after this time ; and the moneys remaining during that period must have accumulated considerably : after peace came on, the money was generally called in and invested into public funds, where it now remains, and is as follows, viz .

" ' Massachusetts Bank Shares, 16 at $500 each, . . $8,000 00

" ' Forty-two and one half Union Bank Shares, at $8, 340 00

" ' Samuel Hinkley & Co. Bond, . . . . . . 416 66

" ' Three per cent. stock, . . . . . . . 4,935 75

" ' Eight per cent. stock, . . . . . . 600 00

Attorney General *v*. Old South Society in Boston & others.

| | |
|---|---|
| " ' Five and a half per cent. ditto, . . . . . | 1,000 00 |
| " ' Massachusetts State note, 5 per cent., . . . | 709 37 |
| " ' Deferred stock of the United States, . . . . | 60 93 |
| | $16,062 71 ' |

" At the meeting at which this report was made, it was voted, ' that a committee of five, three of the church and two of the congregation, be desired to apply to the trustees, the minister and deacons, for the loan of the sums necessary to defray the expenses of building the stores.'

" At a meeting of the church and congregation, held May 11 1800, the following votes were passed:

" ' *Voted*, That the committee appointed on the 22d of April last to borrow moneys of the minister and deacons to defray the expenses of erecting stores on the society's land be hereby discharged from that duty. And it is voted —

" ' That the minister and deacons be requested, and they are hereby authorized, to pay and deliver from the money of the church and congregation to the committee of contractors appointed on the said 22d April, and to any other committee that may be employed to erect said stores, all such sums of money as may from time to time be found necessary by such committees for building said stores; said committee rendering regular accounts thereof to said minister and deacons, so that it may appear how much of said money shall be transferred and changed from their present situation to the property in said stores. And whatever money shall be so paid and delivered shall be considered as having been duly accounted for by said minister and deacons, the present trustees thereof.

" ' And the said minister and deacons shall at all times be entitled to receive so much of the rents and income of said stores as shall amount to six per cent. per annum upon the moneys they shall pay and deliver as aforesaid, to the end that they may be enabled to appropriate the same in like manner as the interest of said moneys has heretofore been appropriated according to the pious intentions of the donors thereof.

" ' And as it is highly probable that the rents and income of said stores will exceed the rate of six per cent. per annum upon said moneys, by reason that the value of the land will be added to the value of the stores, it is therefore voted, that whatever rents and income said stores shall produce over and above the legal interest on said moneys shall go into

the hands of the treasurer distinct from any other funds of the society and shall be used and applied for the purposes set forth in the committee's report of the 20th March last, and which was accepted the 3d day of April last, in such manner as the church and congregation shall from time to time vote and determine; or for such other ecclesiastical purposes as they shall order.'

" In pursuance of this vote, the society received out of the fund fourteen thousand dollars, all of which, except the sum of $5,245, was soon after reimbursed.

" On a pledge of a portion of the stocks, money was borrowed of a bank; and the interest on the loan was paid in advance out of the fund until April 1, 1801, when the stock was sold. The interest so paid amounted in the aggregate to $479.46.

" The committee raised to examine the treasurer's account reported to the society, at a meeting held April 13, 1807, that ' there is due to the Church and Congregation Fund, for the poor thereof, the interest on $5,245, which was vested in the five stores called South Row, as by vote passed by the church and congregation at a meeting held on 11th May 1800; viz : from first day of April, 1801, to first day of April, 1807, six years at six per cent., and, reckoning compound interest, amounts to $2,195.12 ; which interest, by a vote passed as aforesaid, was to be paid from the income of the stores to the minister and deacons, trustees for the distribution of the same ;' and the committee recommends that a vote be passed requiring the treasurer to pay, and ' place under the directions of the trustees, one thousand dollars out of the balance of income from the stores in part of the above interest.'

" The report was accepted, and it was thereupon voted ' that the treasurer be desired and he is hereby authorized to pay the balance of interest due the church and congregation to the first of October next out of income of the stores when received, and that at the end of every quarter year afterwards he pay to the minister and deacons, trustees for the distribution of said interest money, the quarter's interest, being $78.67½, as the same may become due and payable out of the income accruing from said stores.' But it does not appear that any part of this sum, $2,195.12, has been paid.

" In a report of a committee appointed to examine the accounts of the treasurer of the society, made 20th April, 1808, this item appears : ' Interest money of the poor of the church and congregation, subject to the direction of the ministers and deacons, trustees for the fund, $2,509.81.' An item, similarly entitled, amounting to $2,824.49, is also to be found in the report of the committee of 1809.

" At a meeting of the church and congregation held May 22, 1809, ' the committee of ways and means for the purpose of building two parish houses, having considered the subject committed to them,' reported ' that there is in the hands of the treasurer of the society certain capital stock, the interest of which only is appropriated to the use of the poor of the church ; that instead of borrowing money of a bank or of any individuals, and depositing this stock as security for payment, it should be disposed of, or so much thereof as may be found necessary, and the proceeds invested permanently in those buildings ; the interest appropriated to the use of the poor may always be drawn from the surplus of permanent income, as stated in the schedule annexed :

" ' Estimate, viz : 18 bank shares at $500 is $9,000. If they should be sold at 25 per cent. advance, which is 3 per cent. under the price quoted, will produce . $11,250 00
" ' Money when received for pews sold, . . . . 1,290 00
" ' Money of the church and congregation in the treasurer's hands, . . . . . . . . . 2,824 49
" ' 20 pews in the gallery unlet and unsold, if disposed of to workmen in part pay, say, . . . . . . 2,000 00

" ' Making the sum of . . . $17,364 49

" ' This sum, it is supposed, may be sufficient for the purpose of building the two houses. The interest of $11,250 is $675, for the use of the poor.' This report was accepted.

" At a meeting of the church, held June 6, 1809, it was voted ' that the trustees of certain funds placed in their hands be requested to furnish the society with so much from the same as may be required to complete the building of two parsonage

houses, upon conditions that the interest be punctually paid, and that the buildings be insured to secure payment thereof.'

" In December, 1809, on application of the standing committee, the minister and deacons gave them a written agreement, of which the following is a copy :

" ' Whereas, in times past there have been legacies, bequests, and donations made to the Old South Church, to be placed at interest for the benefit of the poor of said church and of the church and congregation, and the interest arising thereon to be distributed among them according to the direction of the ministers and deacons of said church, trustees for the purpose ; and whereas the society have voted to build two parsonage houses on the site whereon the old one now stands, and it appears that the church and congregation, at their meeting on 22d May 1809, voted and accepted the report of a committee by them appointed to devise ways and means to build two parsonage houses, which was to appropriate so much of the capital stock as might be found necessary for that purpose, and the church, at their meeting on the 6th June, 1809, voted that the trustees of the fund be requested to furnish the society with so much from the same as may be required to complete the building of said houses, upon condition that the interest be punctually paid and the buildings be insured to secure the said payment; and whereas the church and congregation, at their meeting on the 7th June, 1809, voted that the standing committee for the year be the committee to contract for building said houses and carry the same into effect; we therefore, the undersigned, ministers and deacons, trustees as aforesaid, in compliance with the above request, do hereby agree to pay to said committee, or to any person or persons appointed by them to receive the same, a sum out of said funds not exceeding fourteen thousand dollars.'

" The standing committee say, in their report communicating the result of their application to the minister and deacons :

" ' We embrace this opportunity to communicate to the society that by the records it appears that there was a committee appointed April 3, 1800, to examine into the state of the funds, who reported that the foundation upon which the funds had arisen consisted of certain tems as they stood in 1766, the whole of which amounted to £880 11*s*. 0*d*. lawful money ; that the funds on 3d April, 1800, consisted of bank shares, specie value $8,000, and other securities nominally to

$8,062.72.  At a meeting of church and congregation, 11th May, 1800, it was voted that the ministers and deacons deliver from the money of the church and congregation, to the committee empowered to erect the stores, such sums as might be necessary for the purpose.  This last sum, when reduced to specie value, amounted to $5,221.40, (sold afterwards for $5,245.00,) and was then considered to be the property of the church and congregation, leaving the bank shares to belong to the church.  By another part of the report of that committee of 3d April, made May 11, 1800, it might seem that the whole $5,221.00 (or $5,245.00) grew out of certain donations from particular persons.  That, however, does not appear to have been the fact; but, on the contrary, arose from the four last items, as stated in that report, amounting to £378 8s. 8d. lawful money.  This statement is founded on that of the committee of 3d April, 1800, on the state of the funds.  The society will therefore consider whether the ministers and deacons had the disposal of the interest of that part, as was then supposed in said vote.  The standing committee are unanimously of opinion they had not that right.  If the society concur in the same opinion, it would seem that the $5,221.40 ($5,245) vested in the stores, as well as the income that has since arisen on the same, was the property of the church and congregation, and entirely at their disposal.  If so, the vote or votes, passed May 11, 1800, as respects the control of the interest by the trustees, should be reconsidered.'

" This report was accepted; but no further action was had thereon.

" The master has not been able to trace any connection between the £378 8s. 8d., the sum of the last four items in the statement of 1766, and the sum of $5,245 invested in the stores.

" The account of the fund now claimed as a poor fund was kept by the treasurer with the South Church, and the general statements of the fund were entered in the books under the head of Church Stock down to 1813, when the money had been advanced for the building of the two parsonage houses.  After that time, no general statement of the fund appears; but the account of what remained thereof was kept as before by the treasurer with the South Church.  In this account the church was credited with the interest on the remaining fund as received, as well as sacramental contributions, and was charged with the expenses of the church before mentioned, and money disbursed to the poor.

" As the sacramental collections were entered with the gifts and legacies made expressly for the use of the poor; as from the earliest account in 1708 to the final discontinuance of these collections in 1849, all the surplus, after payment of certain church expenses, (and a few others, not so clearly of that character, before specified,) was made a part of the fund out of which disbursements to the poor were made, which fund consisted mainly of moneys left by will to be kept at interest for the benefit of the poor; as the church, as early as 1747, by borrowing from it to pay their minister, treated it as a fund not subject to their disposal; and as, when discontinuing the collections, they were called collections ' for the benefit of the poor,' and the discontinuance was voted for the reason assigned, that they were not needed for the poor; the master has been forced to the conclusion that the items of sacramental stock in the statement of 1766, and the balances afterwards transferred, are a part of the poor fund. From the facts he infers that these contributions were originally made with the understanding that any surplus remaining, after defraying certain special church expenses, should be applied to the benefit of the poor. If this was not the clear understanding and intention of the contributors, the balances were so mingled with moneys held expressly in trust for the use of the poor, that it is not practicable now to separate them, and assign to each its due proportion.

" The item in the statement of 1766, called ' Interest received on the above,' is evidently interest on all the preceding items.

" The master is of opinion that the sum of £874 14s. 3d., appearing at the foot of the statement of 1766, is to be regarded as the poor fund at that date, excepting items 11 and 12, which he presumes afterwards became a part thereof, as before stated.

" After 1766, a separate and regular account was kept of all the income received from, and of all disbursements out of, this fund. This account shows that between that date and the 18th April, 1800, this fund increased largely, so that at the latter date 't amounted to the sum of $16,062.71, taking the stocks in which it was invested at their par value. At their market value the sum would be somewhat larger. This increase arose

principally from the rise in the value of the stocks and notes in which the fund was in vested, and from accumulations of income, but in part from legacies, one of which was expressly required ' to be let out at interest, and the interest applied to the use of the poor;' and from small balances transferred almost every year from the sacramental account. During this period, the payments charged in this account were mainly for the poor. After the discontinuance of the separate sacramental account in 1789, a few charges are made of sacramental expenses; and in one case, of expenses of a delegate to an installation. This charge is as follows : ' 30th July, 1789. By cash supplied John Sweetser, Jr., Esq., expenses of journey to New Concord for installment of the Rev. Mr. Evans, as per memorandum. N. B. See folios 33 and 34 for presidents of the like kind, £10.16.4.' (Folios 33 and 34 contain the sacramental account from 1746 to 1751.) There is also a charge in January, 1800, of ' Paid Mr. J. Pierce, for black cloth and flannel, to put the meeting-house in mourning for General Washington, $40.17.' And there is another charge on March 28, 1799 : ' Paid Jeffrey & Russell, for sperm candles, $43.33.' From this date to 1823, sums are charged from time to time for candles ; and the other side of the account shows that, from 1809 to 1826, a sum, which for the first two years was $9.00, and afterwards $10.00, was annually in December credited as ' received at' or. ' of quarterly meetings, for candles;' though these credits do not equal the amount charged during the same time, as paid for candles. Other portions of the book contain accounts of collections taken at meetings held in March, June, September, and December of each year during this period, called Quarterly Charity Meetings, and of the distribution among the poor of the amount so collected.

" In 1808 an addition to this fund was made of $650.00, ' received,' as appears by the books, ' of the treasurer of the late Thursday Evening Charitable Society, as per vote passed Feb. 3, 1808, the income of which to be applied to the benefit of the poor of that church.'

" A separate account was kept for a number of years, with

several of the legacies which were directed to be put at interest. On the one side the interest was credited, and on the other the disbursements to the poor were charged. Such an account was kept with one of the legacies down to 1791, when it was discontinued.

" In accordance with their agreement before recited, the ministers and deacons, in 1810, furnished to the society on May 3, 1810, $4,524.00; on July 1, $4,364,00; and on Jan. 1, 1811, $3,895.75; in all, $12,783.75.

" On January 1, 1811, the society was indebted to the fund as follows:

| | | |
|---|---|---:|
| " For balance unpaid of first loan, . . . . | | $5,245.00 |
| " interest paid the bank to April 1, 1801, . . | | 479.46 |
| " compound interest, as per vote, to April 1, 1807, | | 2,195.12 |
| " interest from April 1, 1807, to January 1, 1811, . | | 1,781.90 |
| " money furnished May 1, 1810, . . . | | 4,524.00 |
| " interest on same to January 1, 1811, . . . | | 180.96 |
| " money furnished July 1, 1810, . . . | | 4,364.00 |
| " interest on same to January 1, 1811, . . . | | 130.92 |
| " money furnished January 1, 1811, . . . | | 3,895.75 |
| | | $22,797.11 |

" From the time of its completion down to 1845, the rent of the ' easterly parsonage house,' so called, was annually paid over to, and received by, the ministers and deacons, instead of interest on the loan. This rent, for the first year, was $450; for the second year, $500; from 1816 to 1828 it ranged from $650 to $775 per year; and from 1828 to 1845 it was $600 per year. By a by-law passed in 1845, the treasurer of the society was directed to pay annually to the deacons, for the use of the poor, the sum of six hundred dollars; and this sum, since that time, has been paid regularly.

" The sums of money annually distributed among the poor are correctly stated in the answers, but these sums were derived, in part, from sacramental collections of the year, from the income of so much of the poor fund as was admitted to be held by the treasurer for the ministers and deacons, and from sources other than the funds of the society.

" The total of disbursements to the poor of the society from its own funds, from July 1, 1811, to January 1, 1861, including the aforesaid sums paid to ministers and deacons, is $29,232.73. The total of interest on the sum due from the society to the poor fund from January 1, 1811, to January 1, 1861, is $62,109.99.

" This difference between these two sums, viz: $32,877.26, added to the aforesaid sum of $22,797.11, makes the amount in the hands of the society, January 1, 1861, belonging to and con-stituting the principal part of the poor fund, viz: $55,674.37.

" The residue of this fund, which in January, 1861, was in the hands of the treasurer of the society, though admitted to be a part of the poor fund, was invested in four shares Massachusetts Bank Stock, $1,000, and in note of Massachusetts Hospital Life Ins. Co. for $1,000, and the fund was indebted to said treasurer in the sum of $52.50.

" It was in proof that the wants of the poor of the Old South Church had been liberally supplied, and that no complaint had been made by any one but the relator, and that no complaint had been made by him that the necessities of the poor had not been liberally supplied.

" The report sets out the facts in evidence, from which the master has drawn his conclusions."

The defendants excepted to the master's report for the follow ing reasons:

1. Because said master has reported the " poor fund " of said church and society to amount to $55,674.37, on the first of January 1861, when upon the facts and evidence it should have been a much smaller sum.

2. Because said master has included and made a part of said " poor fund " of said church and society any other sums than those given to said society or church, or the ministers and dea-cons thereof, for the use of the poor, and the interest thereof unexpended for that purpose.

3. Because the master has included and made a part of the poor fund of said church and society the sacramental contribu-tions named in said report, and also that fund described as the sacramental stock, as well as the interest accruing from said

contributions and fund; the said defendants alleging that, upon the facts and evidence, said contributions and funds formed no part of any fund devoted exclusively to the use of the poor.

The case was reserved by the chief justice for the determination of the whole court.

*J. G. Abbott*, (*J. W. Hubbard* with him,) for the defendants. 1. No case is made for the action of the court, because if here was a public charity it was one to be managed according to the discretion of the ministers and deacons of the church. *Parker* v. *May*, 5 Cush. 351. *Attorney General* v. *Foundling Hospital*, 2 Ves. Jr. 42. But a fund for the poor of a church is not a public charity. *Attorney General* v. *Federal Street Meeting-House*, 3 Gray, 1. 2. The information seeks to set aside an arrangement made between the church and society half a century ago, and which has been acted upon and acquiesced in by all parties to the time of filing this information. A state of affairs so long settled should not be disturbed. *Bogardus* v. *Trinity Church*, 4 Paige, 197. *Harpending* v. *Dutch Church*, 16 Pet. 486. *Humbert* v. *Trinity Church*, 24 Wend. 595. *Foster* v. *Hodgson*, 19 Ves. 183. *Attorney General* v. *Dublin*, 38 N. H. 459. Mitf. Ch. Pl. (6th Amer. ed.) 250, *n.* 1. As between the church and society, a part of the fund was lent in 1800 to the society; and no trust attached to the money so lent. *Attorney General* v. *Rochester*, 5 De G., Macn. & Gord. 797. *Attorney General* v. *Beverley*, 6 De G., Macn. & Gord. 268. *Attorney General* v. *Mayor of Bristol*, 2 Jac. & Walk. 321. *Attorney General* v. *Payne*, 27 Beav. 168. *Mayor, &c. of Southmolton* v. *Attorney General*, 5 H. L. Cas. 1. No interest has been paid on it since 1807. So in reference to the loan of 1811, nothing has ever been paid upon it as a loan since it was made. 3. The poor fund, as reported by the master, is too large, and includes sums that form no part of it. This fund was called the " church stock " till after 1800, and was a fund where all the moneys belonging to the church were kept. This appears from various facts recited in the master's report. In 1800, an attempt was made to ascertain from what source the church funds had arisen and the intention of the donors; clearly showing that they had

not then been appropriated exclusively to the poor. [The fur-ther argument on the matters of fact is omitted.]

*I. F. Redfield & U. H. Crocker,* for the relator.

GRAY, J. This case turns mainly upon questions of fact, and requires more investigation of records and accounts than discussion of legal principles. After a thorough scrutiny, in the light of the elaborate arguments of counsel, of the evidence detailed in the full and careful report of the master, we are unable to concur in his conclusions.

The gift of Dr. Sewall, and the various bequests for the poor of the town, or of the parish or church, were clearly public charities, and to be applied by the ministers and deacons according to the intentions of the donors. Tudor on Charitable Trusts, (2d ed.) 6. *Rex* v. *St. Matthew's,* Burr. Sett. Cas. 574. *Rex* v. *Clifton,* Ib. 697. *Saltonstall* v. *Sanders,* 11 Allen, 455–461, and cases cited.

But the sacramental contributions are not shown to have been so exclusively and absolutely devoted to the poor as to be impressed with the character of a public charity. *County Attorney* v. *May,* 5 Cush. 357, 358. The appropriations from time to time, out of such contributions, for the expenses of administering the sacrament, and the expenses of delegates of the church, were according to the common usages of religious societies in this state. These payments, as well as those for lighting the church and other incidental expenses, and that towards the salary of ministers in 1747, (which does not appear to have ever been refunded,) tend to show that those contributions were not considered or treated as having been devoted exclusively to the relief of the poor. The reasons assigned by the deacons in 1849 for discontinuing such collections show no more than that the sums so collected had been usually given to the poor. It is to be presumed that the small portions of them, specially designated at the time of their contribution as intended for the poor, were immediately so applied.

The mingling of the fund for the poor with the other fund of the church did not entitle the poor to the whole of the church fund. This is not the case of an individual mingling his own

private moneys undistinguishably with funds held by him in trust; but of the officers of a religious society intermingling funds held by them upon distinct trusts, some of which are charitable, and others, although not strictly charitable, are in the nature of religious uses, the property belonging to which is not to be-forfeited by the neglect of the trustees to keep it separate from other trust funds. And there is evidence by which the amount of each fund can be approximately ascertained. It becomes necessary therefore to determine, with as much accuracy as the antiquity of the sources and the imperfection of the evidence will admit, what portion of the funds in question was impressed with the charitable use of relieving the poor.

The earliest piece of evidence upon this question is the statement in the church books in 1766 of "the church stock," which is copied in the master's report. Assuming, as most favorable to the claim of the attorney general, that the "pious and charitable fund," and the fund for the support of the widows and fatherless children of ministers of the church, are to be included in the fund for the poor, derived from charitable bequest and gift, that statement shows that at that time the charity was entitled to the sum of £568.0.1½; that the "sacramental stock" of £186.19.5¼, and the interest accrued thereon of £119.14.8¼, (which is carried out in the statement as part of the "sacramental stock," and there is nothing in the master's report to show that any interest had previously accrued on the other funds,) amounted to the sum of £306.14.1¾; and the whole "church stock" to £874.4.13. This last sum was therefore to be divided between the two funds in the proportion which these sums (£568.0.1¼, and £306.14.1¾) bear to one another, being very nearly thirteen twentieths to the charity, and a little over seven twentieths to the church. The only addition to the charitable fund which is proved to have been made before 1800 is of £50 by Thomas Hubbard's bequest in 1773.

In 1800 the whole church stock, estimated at the par value of the securities in which it was invested, amounted to the sum of $16,062.71, and at the market value of these securities to somewhat more. Even if we assume its whole value in 1800

to have been $18,000, the proportion of it belonging to the charity would not have exceeded $11,700, and, even adding Hubbard's legacy of £50, in lawful money of the Province at six shillings to the dollar, or $166.67, and the further sum of $650 received from the Thursday Evening Charitable Society in 1808, would amount to but $12,516.67. The poor's fund therefore appears to have received all that belonged to it by the sum of $12,783.75 invested in building two parsonage houses on land of the society in Milk Street under the agreement of the ministers and deacons with the society in December of that year. If we more particularly follow the transactions between 1800 and 1809, the result is substantially the same.

On the 3d of April 1800, a committee of the society recommended the erection of five brick stores on their land on Washington Street, and the borrowing of money of the society for the purpose, the committee being of opinion that, after paying the same interest upon the sum borrowed as it was then producing, there would be a surplus of rents which might be applied towards the support of an additional minister, " in doing which," it was the opinion of the committee, " the views of the donor not only of the land, but those who have left legacies from time to time, will be fully answered, as the poor of said society will have as much as they now receive, and the other will be laid out in pious uses for the support of public worship." Another committee, appointed at the same meeting to examine into the funds of the church and congregation, their sources, and the intentions of the donors, made a report showing the amount of legacies and gifts for the poor as £435.10.2, or about £65 less than in 1766 ; the fund for ministers' widows and children, apparently including the " pious and charitable fund," at the same amount as those two funds in 1766, £66.19.2 ; the balance arising from sacramental collections, as in 1766, at £186.19.5 ; and three other sums, supposed to belong to the church or congregation, at £191.2.3 ; (omitting any mention of interest on sacramental collections, which had probably been expended since 1766 ;) showing the whole amount at £880.11.0 ; of which, according to the classification above applied to the church stock of

1766, £502.9.4 belonged to the charity, and £378.1.8 to the church. As this statement is less favorable to the charity than that of 1766, we have assumed the earlier one as the basis of apportionment.

On the 11th of May 1800 the society voted that the minister and deacons ·be requested and authorized to pay out of the moneys of the church and congregation the sums necessary to · build the stores ; and be entitled to receive annually out of the rents thereof six per cent. upon the amount so invested, to be appropriated by them " in like manner as the interest of said moneys has heretofore been appropriated according to the pious intentions of the donors thereof." Pursuant to this vote, there was paid to the society out of the fund the sum of $14,000, of which $8,755 was soon afterwards reimbursed. As the whole amount of the church stock was then estimated at about $16,000, of which the charity was not entitled to more than thirteen twentieths, or $10,400, it is evident that the whole $14,000 borrowed from the church stock did not come from that part of it which belonged to the charity. In the absence of any evidence to the contrary, it may be presumed that the $14,000 so invested, and the surplus of $2,061.71, each belonged proportionally to the charity and to the remaining funds of the church. The charity then would be entitled to thirteen twentieths of the $14,000 invested in the stores, or $9,100, being very little more than the $8,755 which was immediately reimbursed; and nearly the whole of the $5,245, which was not reimbursed, would belong to the church absolutely. The vote of 1807 recognizing this sum of $5,245 as " due to the church and congregation fund for the poor," so far as it expressed the right of the poor to this amount, was therefore erroneous, as the society appear in 1809 to have discovered. In May 1809 the fund appropriated to the use of the poor is stated to consist of bank shares of the par value of $9,000, (which substantially corresponds with the proportion contributed by the charity towards the building of the stores, and with the sum reimbursed immediately after they had been built,) and really worth $11,250. Adding to this sum thirteen twentieths of the surplus of $2,062.71, which had not before been

invested in land, or $1,340.76, and the sum of $650 received from the Thursday Evening Charitable Society in 1808, would make $13,240.76, a sum not exceeding by five hundred dollars the sum of $12,783.75 invested in the parsonage houses under the agreement of 1809.

The court is therefore unanimously of opinion that this sum of $12,783.75 may fairly be taken as the principal sum belonging to the charity and invested in real estate at that time; and the remaining question is of the amount of interest and income thereof with which the defendants should be charged. The agreement of 1809, under which this principal sum was paid by the minister and deacons to the society, recited that "in times past there have been legacies, bequests and donations made to the Old South Church, to be placed at interest for the benefit of the poor of said church, and of the church and congregation," (that is, one part for the poor of the church, and another for the poor of the church and congregation, as appears by the terms of the original gifts,) "and the interest arising thereon to be distributed among them according to the directions of the minister and deacons of said church, trustees for the purpose;" and also recited the votes, passed in May and June 1809, for building the two parsonage houses, and obtaining from such trustees so much of the capital stock as might be required for that purpose, "upon condition that the interest be punctually paid and the buildings be insured to secure the said payment." Instead of the interest on the sum so appropriated and invested, the rent of the easterly parsonage house, from the time of its completion until 1845, was annually paid by the society and received by the minister and deacons, for the use of the poor. In 1845 the society passed a by-law to pay annually to the deacons, for the use of the poor, the sum of $600, which has been regularly paid ever since.

The length of time for which a court of chancery will require the trustees of a charity to account for income which has not been applied according to the intentions of the donors is much affected by the particular circumstances of each case. An arrangement made in good faith and acted upon for many years

will not be lightly disturbed. But the statute of limitations affords no absolute bar or limit; and when trustees, with knowl edge of the charitable use, and no reasonable excuse for mistake, have misappropriated the whole or part of the income, they will be held to account for it during the whole period of misappropriation, unless grave inconvenience or hardship would be caused by so doing. Tudor on Charitable Trusts, 341, 342, and cases cited. *Man* v. *Ballet,* 1 Vern. 44. *Attorney General* v. *Mayor &c. of Stafford,* Barnard. Ch. 36. *Attorney General* v. *Mayor, &c. of Newbury,* 3 Myl. & K. 647. Applying these principles to this case, we are of opinion that the rent of one of the two houses built with the aid of money of the charity on land of the society, which rent was paid and received annually for a period of more than thirty years ending in 1845, instead of interest upon that money, although for the greater part of that period less than such interest at the common rate would have been, yet must, in the absence of any evidence of bad faith or unreasonableness in an arrangement which was acted upon so long and terminated more than twenty years ago, be deemed a substitution for and satisfaction of such interest during the same period; but that since 1845, when the payment and receipt of such rent ceased, to the time of the filing of this information in 1859, and since, the charity is entitled to interest at the rate of six per cent. annually, deducting therefrom the yearly payments of $600 made by the society to the deacons for the use of the poor.

The principal sum of $12,783.75, with so much of the interest thereon since 1845 as thus remains unpaid, together with the further principal sum of $1,947.50, belonging to the charity, which is admitted to have been in the hands of the treasurer of the society in January 1861, with interest on that sum also from that time to the date of the decree, will constitute the amount due to the charity. The defendants' exceptions to the master's report are therefore sustained.

A decree may be entered for the payment of that amount by he society to the ministers and deacons of the church to be held by them for the use of the poor, according to the intentions

of the donors. The ministers and deacons being a corporation established by law, with authority to receive the fund for this purpose, it is not necessary or usual to prescribe a scheme for its application, before ordering it to be paid to them. Gen. Sts. *c.* 31, §§ 1, 2. *Society for Propagation of the Gospel* v. *Attorney General,* 3 Russ. 142. *Walsh* v. *Gladstone,* 1 Phillips R. 290.

As the intermingling by the defendants of the fund of the charity with other funds has afforded ground for this information, and the information is sustained in part, the costs incurred in support of it, taxed as between counsel and client, are to be paid out of the charity fund; and the defendants will bear their own costs. *Attorney General* v. *Brewers' Co.* 1 P. W. 376. *Attorney General* v. *Mayor, &c. of Stafford,* Barnard. Ch. 37. *Attorney General* v. *Kerr,* 4 Beav. 303.

*Decree accordingly.*