Argued June 29, reversed and remanded October 23, rehearing denied December 27, 1923, mandate recalled January 7, motion to reopen case denied January 14, corrected decree entered January 14, petition to amend mandate denied January 22, trustees appointed by Circuit Court approved January 29, motion to recall mandate denied February 26, 1924.

## AUGUST WEMME ET AL. *v.* FIRST CHURCH OF CHRIST, SCIENTIST, ET AL.

(219 Pac. 618; 223 Pac. 250.)

**Wills—Effect Given to Testator's Intent Gathered from Will as a Whole.**

1. In construing a will its whole context must be considered, and effect given to the intention of the testator, but such intention must be gathered from the words used in the will.

**Wills—Testator Could Dispose of Property in Any Lawful Manner.**

2. A testator had a right to dispose of his property in any lawful manner or for any lawful purpose.

---

1. Law governing construction of a will, see note in 2 L. R. A. (N. S.) 443.

**Charities—Charitable Bequest not Void Because of Uncertainty.**

3. A charitable bequest or devise is not void merely because the trustees are uncertain or incapable of taking or because the objects of the charity are indefinite and uncertain.

**Charities—Court will Appoint Other Trustees in Lieu of Trustees Who have Failed to Administer Trust.**

4. Where the objects of the charity contemplated by will creating charitable trust had not failed, but the trustees had failed to administer the trust, the property did not revert to the heirs or residuary legatee, where the will does not so provide, but it was the duty of the court to appoint other trustees to conduct the charity and to administer the trust according to the directions of the testator.

**Charities—Will Held Sufficiently Definite and Certain to Constitute Good Devise of Trust Property to Corporation to be Organized by Trustees.**

5. Will directing trustees to form a corporation for the purpose of holding real estate and conducting a maternity home for wayward girls, and directing the trustees to convey the property to such corporation, and to transfer the stock thereof to six named churches in equal parts, and suggesting that the maternity home be continued by the corporation, but stating that "I do not make this binding" upon such churches and corporation, and that "I have given absolutely and without reservation all of the stock of said corporation" to such churches, *held* sufficiently definite and certain to constitute a valid devise of the trust property to the corporation.

**Charities—Corporation Organized by Trustee to Hold and Lease Property Devised in Trust and to Conduct Maternity Home for Wayward Girls Held a "Charitable Corporation."**

6. Where will directed trustees to organize a corporation for the purpose of holding and leasing the real estate devised in trust and conducting a maternity home for unfortunate or wayward girls, the corporation was not one organized for profit, but was exclusively charitable.

**Corporations—Can Exercise No Power not Authorized by Statute.**

7. A corporation is purely a creature of the statute, and can exercise no power unless the statute expressly or by necessary implication authorizes it.

**Charities—Will Directing Trustees to Organize Corporation and Assign Stock to Churches Held to Require Churches to Use Proceeds for Charitable Purposes.**

8. Where will directed trustees to organize a corporation to hold and lease the property devised in trust, and to conduct a maternity home for wayward girls, and to transfer the stock to named

---

4. Enforcement of general bequest for charity or religion, see notes in 14 L. R. A. (N. S.) 49; 37 L. R. A. (N. S.) 993.

5. Gift for establishment of home for persons of particular class as charitable gift, see note in Ann. Cas. 1917E, 857.

churches "for their own respective uses and benefit and without any charge or trust reserved to my estate," and suggested that the maternity home be continued, but stated that "I do not make this binding," the churches did not receive an absolute and unconditional gift of the real beneficial ownership of the trust property with the right to discontinue the charity, dissolve the corporation, and distribute its assets among themselves, but were required to use the proceeds of the property for the charitable purposes contemplated by the will.

**Charities—Franchise Entitling Charitable Corporation to Perpetual Existence cannot be Taken Away by State Except for Just Cause.**

9. A franchise granted by the state to charitable corporation, entitling it to perpetual existence, cannot be taken away by the state except for just cause.

**Wills—Precatory Trust Requires Gift of Property to One Person for Benefit of Another.**

10. In order to raise a precatory trust, it is necessary that there be a gift of property to one person for the benefit of another.

**Wills—"Precatory Words" are Imperative if It Appears They were Intended to Create an Obligation.**

11. Precatory words are words of recommendation, entreaty or wish, and it is sufficient to make them imperative, if it appears that they were intended to create an obligation.

**Charities—Churches Could not Use Proceeds for Different Purpose Merely Because Purpose Contemplated by Will Violated Religious Convictions.**

12. Where a testator directed trustees to organize a corporation for the purpose of holding and leasing the property devised in trust and conducting a maternity hospital for wayward girls, and to transfer the stock to named churches which he requested to continue such home, the churches could not use the proceeds of the property for other purposes, on the ground that they could not administer the trust in operating the maternity home without violating the religious convictions of the members of their churches.

**Charities—Devisees Could not Use Proceeds of Trust Property for Purpose Other Than That Contemplated Without Procuring Decree of Court of Competent Jurisdiction.**

13. Where a testator directed trustees to organize a corporation for the purpose of holding and leasing the property devised in trust and conducting a maternity hospital for wayward girls, and to transfer the stock to named churches, upon failure of the objects of the charity, the churches could not use the proceeds of the property for other purposes without applying to a court of competent jurisdiction and securing a decree directing that the change be made.

10. Creation of charitable trust by precatory words in will, see note in 14 L. R. A. (N. S.) 646.
See 11 C. J., p. 370 (See 1925 Anno.).

Trusts—Trust Estate must Bear Necessary Expenses of Administration.

14. A trust estate must bear the necessary expenses of its administration.

Charities—Attorneys Who Successfully Opposed Destruction of Charitable Trust Entitled to Compensation Out of Fund.

15. Attorneys of parties who successfully opposed destruction of a charitable trust *held* entitled to compensation out of the trust fund.

### ON MOTION RE ATTORNEY'S FEES.

Charities—Right of Attorneys to Fees for Opposing Destruction of Trust Dependent on Right of Client to Costs Including Such Fee.

16. In opposing destruction of a charitable trust, while allowance of attorney's fees, out of the fund in control of equity, is sometimes made directly to the attorneys, the right thereto is dependent on the right of their client to such fees, and, if the client is not entitled to costs, including attorney's fees, no allowance can be made directly to the attorney.

Attorney General—Counsel Representing Attorney General Held not Entitled to Compensation Out of Funds in Court.

17. Notwithstanding that under Sections 2769–2779, Or. L., Laws of 1921, page 476, the Attorney General is not required to represent the state in proceedings relating to a public charity, in view of Section 2773, Or. L., imposing on the Attorney General powers incident to that office at common law, among which is the enforcement of public charities and Laws of 1921, page 476, authorizing him to appoint assistants at annual salaries only, which under Section 2978 shall be in lieu of all other salaries and fees, such statutes and acts prohibit an allowance, out of funds in court, of fees to a special attorney appointed by the Attorney General to intervene and represent the public interest in a suit between private litigants involving the ownership of the property included in a charitable trust.

From Multnomah: Harry H. Belt, Judge.

In Banc.

Reversed and Remanded. Rehearing Denied. Motion to Reopen Denied. Motion Re Attorney's Fees Denied.

For appellants there was a brief over the names of *Mr. Dan E. Powers* and *Mr. Walter P. La Roche*

for the State of Oregon, with an oral argument by *Mr. Thomas Mannix.*

For respondents there was a brief and oral argument by *Mr. Guy C. E. Corliss.*

RAND, J.—This is a suit for an account and to recover certain devised trust property. Plaintiffs, with the exception of the E. Henry Wemme Company, are the next of kin and sole heirs at law of E. Henry Wemme, who died testate at Portland, Oregon, on December 17, 1914. The E. Henry Wemme Company is a corporation and is the sole residuary legatee of the testator. The property devised in trust consisted of three tracts of land in Portland, Oregon, of the value of $350,000. The provisions of the will relating to the trust are in these words:

"I give, devise and bequeath unto H. A. Weis, Jessie M. Carson and J. J. Cole and their successors, Lots one (1), Four (4), Five (5) and Eight (8) in Block Fifty-three (53) in Couch's Addition to the City of Portland, and also Lots One (1) and Four (4) and the south Twenty (20) feet of Lot Five (5) in Block Nine (9) of Couch's Addition to the City of Portland, and the South One Hundred Twenty (120) feet of Block Seventy-two (72) in East Portland, now a part of Portland, and all now being in the City of Portland, Multnomah County, State of Oregon, to be held in trust, however, by said H. A. Weis, Jessie M. Carson and J. J. Cole and their successors for the uses and purposes hereinafter set forth as follows: Said trustees and their successors shall have power and authority to hold, manage, improve, repair or lease said property or any part thereof without any other authorization than that hereby given, and shall collect all rents, issues and profits arising from said property, and shall from such rents, issues and profits, first pay all taxes, assessments and charges

of whatsoever kind or nature lawfully made against said property, or any part thereof.

"My said trustees shall immediately after my death cause to be formed a corporation under the name of 'E. Henry Wemme Endowment Fund' under and by virtue of the laws of the State of Oregon, providing that the duration of said corporation shall be perpetual, that its principal office and place of business shall be in the City of Portland, County of Multnomah and State of Oregon, with a capital stock to be determined by my trustees, not to exceed, however, the reasonable value of the property hereinbefore devised to my trustees at the time of such incorporation, and incorporated for the purpose of buying, owning, holding, managing, improving, mortgaging and leasing the real property hereinbefore devised to my trustees, and for the purpose of conducting a maternity home or lying-in hospital for unfortunate or wayward girls in the City of Portland, Multnomah County and State of Oregon.

"My said trustees shall jointly subscribe for all of the capital stock of said corporation, and shall thereupon complete the organization and cause such action to be taken by it that it shall purchase of my said trustees all of said property hereinbefore devised to my trustees, and in payment therefor, issue its capital stock to my said trustees, jointly, and thereupon said trustees shall by good and sufficient conveyance or conveyances grant, bargain, sell and convey to said E. Henry Wemme Endowment, a corporation, all of the real property hereinbefore devised to said trustees, and thereupon the capital stock of said corporation of E. Henry Wemme Endowment Fund shall be issued to said trustees jointly in one certificate which capital stock witnessed by said certificate shall be held in trust by said trustees and disposed of by them as hereinafter directed.

"Immediately upon the completion of the organization of said E. Henry Wemme Endowment Fund, and the transfer to said corporation last mentioned of the property herein devised to my trustees, then and

thereupon said corporation shall have the right to borrow a sum of money not to exceed Seventy-five Thousand and No/00 ($75,000.00) Dollars, upon the promissory note of said corporation, and to secure the payment of such promissory note by mortgage executed by it covering Lots One (1) and Four (4) and the South Twenty (20) feet of Lot Five (5) in Block Nine (9) of Couch's Addition to the City of Portland, in Multnomah County, State of Oregon, said promissory note and mortgage shall contain such provisions and conditions as may be determined and agreed upon by said corporation and the person, firm or corporation from whom it may secure such loan.

"After securing money on the mortgage hereinbefore provided to be executed by it the said E. Henry Wemme Endowment Fund shall proceed to purchase suitable real estate as a site for a maternity home for unfortunate and wayward girls, and shall construct thereon a suitable home for the reception, accommodation, care, treatment and comfort of unfortunate and wayward girls who may be in need thereof, and shall furnish, equip and maintain such maternity home without cost or charge to the inmates thereof, but shall use the rents, issues and profits arising and issuing out of the property owned by said E. Henry Wemme Endowment Fund, in maintaining, furnishing and equipping said maternity home, and in caring for and providing for the inmates thereof, making a provision, however, should the said corporation deem it necessary, for a sinking fund from such rents, issues and profits, to pay out thereof, when it shall have become due said note given by the corporation as hereinbefore provided. Said maternity home shall be known as The White Shield of Portland, Oregon, and the inmates shall be admitted thereto irrespective of religion or nationality.

"Said corporation by and through my said trustees who shall constitute the Board of Directors thereof, shall after the construction of said home open and

thereafter conduct the same for the accommodation, care and keeping of unfortunate and wayward girls as a lying-in hospital without charge therefor.

"In case of the death, resignation or permanent inability of any or either of my said trustees to act as such trustee or trustees, then and in that event the successor or successors of my trustees shall have the right and shall name and appoint the successor or successors of my trustees who may die, resign or be permanently disabled from the performance of the duties as my trustee hereunder, and such successor shall have the right in the same way to appoint their successors and so it shall continue, and a majority of the trustees shall have the right to exercise full power and authority under and by virtue of the provisions of this my last will and testament.

"Upon the expiration of three years from and after my death I direct that my trustees transfer to the different churches of the Church of Christ Science of Portland, Oregon, authorized and chartered by the head Church of Christ Science known as the Mother Church of Boston, Massachusetts, all of the capital stock of said E. Henry Wemme Endowment Fund, in equal parts, to be theirs forever, for their own respective uses and benefit and without any charge or trust reserved to my estate of whatsoever kind or nature, and thereupon my trustees and their successors shall be considered as having completed their duties hereunder and discharged.

"I hope, however, this is not directory, but merely a suggestion that the maternity home constructed as hereinbefore provided shall be continued by said corporation, E. Henry Wemme Endowment Fund, perpetually and forever, but I do not make this binding upon said Church of Christ, Science, or upon said E. Henry Wemme Endowment Fund, a corporation, for the reason that I have implicit faith and confidence in the Church of Christ Science, and believe that they will be perpetual and I realize the inability of one now living to determine what in the future might be the greatest need and benefit to suffering

humanity, and therefore I have given absolutely and without reservation all of the stock of said corporation of said E. Henry Wemme Endowment Fund, to said Church of Christ Science believing that they will expend the rents, issues and profits and all the proceeds of the said E. Henry Wemme Endowment Fund in a manner so as to create the greatest relief for the greatest number of suffering humanity."

After the death of the testator the trustees, pursuant to his direction, incorporated the E. Henry Wemme Endowment Fund and conveyed said devised property to said corporation. As directed by the will the articles of incorporation provided for the corporation to have capital stock, which stock was issued in the name of the three trustees, in one certificate. The corporation then borrowed the sum of $75,000 upon its note and mortgage, purchased a site in the City of Portland suitable for a maternity home or lying-in hospital, erected the necessary buildings thereon, furnished and equipped the same and received and admitted into said maternity home and lying-in hospital those persons requiring the need of such an institution who came within the class designated by the testator in his will, and furnished to them, free of charge, the services provided for by the testator.

Three years after his death the trustees transferred in equal shares, to the defendant churches, the capital stock of the E. Henry Wemme Endowment Fund, and thereupon the defendant churches each elected one of its own members as a director and continued to operate said maternity home and lying-in hospital for several months thereafter. The churches then caused said maternity home and lying-in hospital to be closed and thereafter refused to admit any of the class of persons designated by the testator into said

institution, although at the time there were a large number of persons of that class requiring the services of such institution. They then sold the maternity home and lying-in hospital to the Salvation Army, which has since operated and conducted the same as a maternity home and lying-in hospital.

Thereupon the plaintiffs brought suit to recover the devised property from the defendant churches, contending that the trust was so indefinite and uncertain that it rendered the devise void, and that because thereof the title to the devised property had not passed from the heirs or the residuary legatee of the devisor. They also contended that if the trust was sufficiently definite and certain to make the devise good, the defendant churches had breached the trust by their sale of the maternity home and refusal to conduct the particular charity provided for by the testator, and that because thereof the property had reverted either to the heirs at law or to the residuary legatee.

By order of the court the attorney general of the state was made a party defendant. He appeared and by leave of the court filed an answer in the nature of a cross-complaint. In substance he alleged that the testator intended, by his will, to create a charitable corporation, and to that end had devised his real property in trust. He alleged that the churches had breached the trust and prayed that the trust be enforced, and that because of their alleged breach of the trust, the churches be removed as trustees and that new trustees be appointed to administer the trust according to the directions of the testator.

In substance the defendant churches alleged that the testator intended, by his will, to make an absolute and unconditional gift to the churches, not only of

the stock of the E. Henry Wemme Endowment Fund, but also of the real, beneficial ownership of the devised trust property, and that under the terms of the will the churches have become and now are the absolute and unqualified owners of the stock and of the full, legal and equitable title to the corporate property of the E. Henry Wemme Endowment Fund.

They also allege, in effect, that in order for them to conduct a maternity home and lying-in hospital in accordance with the laws of this state, it will be necessary for them to provide medical services for the inmates thereof, which, under the doctrines and teachings of their church, are prohibited, and that for them to operate an institution of that character and comply with the law would require them to act contrary to the religious convictions and beliefs of their members.

They also allege that although the churches are under no legal obligation to use the devised property for any trust purpose, yet the churches consider themselves under a moral obligation to carry out the wishes of the testator so far as it can be done under the teachings and doctrines of their church, and that the churches have, therefore, purchased a tract of land in Clackamas County, Oregon, upon which they propose to erect buildings for use by paid practitioners of their own religious belief in healing persons having faith in the efficacy of Christian Science treatment, and they allege that the institution they intend to found will be a charitable one and that its maintenance and support will, to all intents and purposes, conform to the directions of the testator, even if it should be held that the defendant churches have not acquired the full, complete and absolute ownership of the trust property.

They also allege that the Salvation Army, to whom the sale of the maternity home and lying-in hospital was made, has ever since conducted a maternity home and lying-in hospital at the place where it was established and conducted by the trustees.

The prayer of the churches is that the court decree that the defendant churches are the absolute owners of the corporate property of the E. Henry Wemme Endowment Fund, that the churches hold the same free of all trust obligations, and that their accountability for the management of said property is only that which said churches owe to their own members.

At the conclusion of the trial a decree was entered in the Circuit Court dismissing plaintiff's complaint and the cross-bill of the attorney general, and decreeing that each of the six defendant churches is the absolute owner of one-sixth of the corporate stock of the E. Henry Wemme Endowment Fund, and through such ownership is the absolute, equitable owner of all of the assets and property of said corporation, and that neither the E. Henry Wemme Endowment Fund, as a corporation, nor the defendant churches, by reason of their ownership of the stock, are subject to any charitable trust or charged with any trust obligation whatsoever. From this decree the plaintiffs and the attorney general have appealed.

1, 2. The decision of this controversy depends entirely upon the construction to be given to the will, the material part of which has been quoted. In construing a will its whole context must be considered and the court must take the instrument by its four corners and give to it the construction which will effectuate the intention of the testator. The purpose of construing a will is to ascertain the intention of the testator, and this must be gathered from the words

used in the will, as words not used cannot be added. This construction must be collected from the words of the will itself and not from any averment out of it: 1 Worthington on Wills, *75. When the intention of the testator has been thus ascertained, it must be given the effect he intended it to have. He was dealing with his own property and had a right to dispose of it in any lawful manner or for any lawful purpose. He could give it to charity or not, as he pleased. He had a right to give it to a particular charity for three years and then by gift over to the defendant churches, if he cared to do so. Whether that was his intention is the main question involved here, for it is certain that the devised trust property has passed beyond the reach of his heirs at law or his residuary legatee.

It is obvious from the plain language of the will that the testator intended to be the founder of a public charity. To accomplish that purpose he devised real property of great value in the City of Portland, to three trustees, whom, in express terms, he directed to form and organize, exclusively for charitable purposes, a corporation that would bear his name, and whose duration would be perpetual, and directed them to convey the devised property to said corporation.

Where property is devised for the purpose of creating a private trust, the trustees who are to take and hold the legal title must be definite and certain and the beneficiaries of the trust must be clearly identified or be made capable of identification by the terms of the will; but where, as here, property is devised for charitable purposes, the rule is entirely different.

3. In the case of a charitable bequest or devise, it matters not that the trustees are uncertain or in-

capable of taking or that the objects of the charity
are indefinite and uncertain: Note 1 on Charitable
Bequests by Mr. Justice STORY, appended to 17 U. S.
*12 (4 L. Ed. 499).

It is said that a public charity begins where un-
certainty in the recipient begins. It is therefore
essential to the creation of a charity that the benefi-
ciaries should be uncertain, for they consist of a class
of persons described in some general language, often
fluctuating, changing in their individual members and
partaking of a *quasi*-public character: *Pennoyer* v.
*Wadhams*, 20 Or. 274, 276 (25 Pac. 720, 11 L. R. A.
210); *In re John's Will*, 30 Or. 494 (47 Pac. 341, 50
Pac. 226, 36 L. R. A. 242); 2 Perry on Trusts, § 687.

"In order that a trust may be charitable, the gift
must be for the benefit of such an indefinite class of
persons that the charity is really a public and not a
mere private benefaction." 3 Pomeroy's Equity
(3 ed.), § 1019.

"If lands are given to a corporation for charitable
uses, which the donor contemplates to last forever,
the heir never can have the land back again; but if
it becomes impracticable to execute the charity, an-
other similar charity must be substituted, so long as
the corporation exists." See note by Mr. Justice
STORY, *supra*, *16.

4, 5. The property that the testator intended to
donate to the charity is specifically described in the
will. There are no words contained in the will by
which the property can ever revert to the heirs or to
the residuary legatee. The gift was immediate and
absolute and vested the title to the property in the
trustees as soon as the will took effect. From that
moment the property became impressed with the
trust and passed beyond the reach of the heirs or

residuary legatee. Hence the charitable use of the devised property cannot fail, for, as said by Mr. Justice STORY in his note, *supra:* "If the charity does not fail, but the trustees or corporation fail, the court of chancery will substitute itself in their stead, and carry on the charity." The terms of the will were sufficiently definite and certain to constitute a good and valid devise of the trust property to the E. Henry Wemme Endowment Fund. The title to the devised property is vested in that corporation and can never become vested in the heirs or in the residuary legatee.

The contention over the ultimate disposal that the devisor intended to make of the devised property arises from the fact that the purposes for which he directed, in express terms, the E. Henry Wemme Endowment Fund to be formed and organized were exclusively charitable, while, at the same time, he directed that it should have and issue capital stock, the par value of which should be equal to the value of the devised property; that the stock should be accepted by the trustees in payment for the devised property; that it should be held by them in trust for three years after his death and should then be transferred to the defendant churches in equal shares to be theirs forever for their own respective uses and benefit,and without any trust or charge reserved to his estate, and accompanied these provisions with these words:

"I hope, however, this is not directory, but merely a suggestion that the maternity home constructed as hereinbefore provided, shall be continued by said corporation, E. Henry Wemme Endowment Fund, perpetually and forever, but I do not make this binding upon said Church of Christ, Science, or upon said

110 Or.—13

E. Henry Wemme Endowment Fund, a corporation, for the reason that I have implicit faith and confidence in the Church of Christ Science, and believe that they will be perpetual and I realize the inability of one now living to determine what in the future might be the greatest need and benefit to suffering humanity, and therefore I have given absolutely and without reservation all of the stock of said corporation of said E. Henry Wemme Endowment Fund, to said Church of Christ Science believing that they will expend the rents, issues and profits and all the proceeds of the said E. Henry Wemme Endowment Fund in a manner so as to create the greatest relief for the greatest number of suffering humanity.''

The churches contend that the effect of these provisions was to vest in them, three years after the death of the testator, not only the absolute ownership of the stock itself, but also the real beneficial and equitable ownership of the assets and property of the E. Henry Wemme Endowment Fund, and that as the legal and equitable title is now merged in one ownership, the corporate property of the E. Henry Wemme Endowment Fund is discharged from the trust and relieved of all trust obligations. In other words, they contend that by their acquisition of the stock they have become the sole stockholders of the corporation, and as such they are vested with all of the rights and privileges that a stockholder owning all of the stock would have in a corporation organized for profit. Stated briefly, the right possessed by a stockholder of a corporation organized for profit is the right to be recognized as a stockholder, to share in the making of its by-laws and the election of its board of directors, to receive a *pro rata* share of the corporate profits, in dividends, when declared, and upon its dissolution to participate *pro rata* in the

ultimate assets remaining after its debts have been paid.

6. The E. Henry Wemme Endowment Fund is not a corporation organized for profit. It was organized by the trustees in conformity to the directions of the testator who prescribed in explicit terms the purposes for which the corporation was to be formed and organized. He prescribed that the corporation was to be "incorporated for the purpose of buying, owning, holding, managing, improving, mortgaging and leasing the real property hereinbefore devised to my trustees, and for the purpose of conducting a maternity home or lying-in hospital for unfortunate or wayward girls in the City of Portland, Multnomah County and State of Oregon." These purposes are solely and exclusively charitable and a corporation organized for the sole purposes stated by the testator is purely an eleemosynary corporation, which, as defined by Sir William Blackstone, is one "constituted for the perpetual distribution of the free alms or bounty of the founder of them to such persons as he has directed. Of this kind," he says, "are all hospitals for the maintenance of the sick, poor and impotent." 1 Blackstone, *471.

In *Carson* v. *Schulderman,* 79 Or. 184 (154 Pac. 903), the determination of this identical question as to this particular corporation was presented to this court upon the question of whether the trustees should be required to pay the fees provided by statute for the filing of articles of incorporation of a corporation organized for commercial purposes or the fees of one organized for charitable purposes, and it was held that this corporation was organized for charitable purposes and not for profit, notwithstanding that the articles of incor-

poration themselves provided for the issuance of capital stock.

No words can be found in the will which in any way authorize or empower the corporation to sell or dispose of the devised property or any part thereof, or to use the rents, issues and profits of the devised property for any purpose except to maintain and support a maternity home and lying-in hospital. The purpose for which the testator directed that the corporation should be formed and organized was to dispense the bounty of the testator, the donor of the property, in carrying out the specific objects and purposes expressly stated and declared by him in the will. In fact, it was impossible for the trustees to incorporate any corporation except an eleemosynary one if they complied, as they were bound to do, with the directions contained in the will. The testator specifically enumerated in the will the purposes for which the corporation was to be formed. This enumeration of the powers of the corporation, by necessary implication, excludes the exercise by the corporation of any powers except those enumerated or such as are necessary to carry into effect the powers so enumerated. The will expressly declared that the duration of the corporation shall be perpetual, and conferred no power upon the corporation to use the rents, issues and profits of the devised property for any purpose except for the maintenance and support of the maternity home and to repay the money borrowed to erect and establish the same. All of these purposes were charitable. Under the specific directions of the testator the corporation could not engage in any enterprise or pursuit not charitable. Hence, it could engage in no business or pursuit for gain upon which it could earn a revenue or realize a profit.

It could therefore acquire no funds subject to the payment of dividends, and it could have no stockholders possessing any of the rights that ordinarily attach to a stockholder of a corporation organized for profit. In the nature of things, the possessor of stock issued by a corporation organized solely and exclusively for charitable purposes, as this one was, can acquire no right to receive dividends or to participate in the distribution of its assets, if, for any reason, it should be dissolved, as the funds of the corporation and its assets, in case of dissolution, must be used exclusively for charitable purposes, and if it becomes impracticable to execute the particular charity provided for by the donor, another similar charity must be substituted. See Mr. Justice STORY's note, *supra*.

"A charitable corporation is not an association of shareholders, like a business corporation or joint-stock company; but is merely an agent or trustee for the administration of trust funds, and the beneficiaries of the trust are the donees of the charity, and not the members of the corporation." Section 34.

"The distinguishing feature of charitable corporations is, that they are formed for the administration of charitable trusts, and not for the profit of the corporators themselves; for example, corporations formed for the management of free hospitals and asylums for the relief of the poor, insane, blind, or otherwise helpless. * * A charitable corporation is merely a trustee or agent selected by the donor of the charity for the purpose of administering funds given for charitable purposes, and the beneficiaries of this trust are frequently the public, or parties outside of the corporation." Section 4.

"The right of a majority of shareholders to wind up the company's business, and distribute its assets, exists only provided the company was formed solely for the benefit of its shareholders. The majority of

a charitable corporation, or any corporation formed to administer a trust in favor of third persons, evidently possess no such power.'' Section 414, 1 Morawetz on Corporations (2 ed.).

"From their very nature religious, educational, charitable and fraternal and social organizations are neither intended nor authorized to have capital stock. Generally, the necessity and authority for capital stock is limited to corporations that are intended for the financial benefit of the members, while it is not required or authorized for those not so intended.   As shown in a preceding section, the authority to issue capital stock is statutory, and must be plainly conferred.'' 4 Thompson on Corporations (2 ed.), Section 3402.

The only cases to which our attention has been called, where a corporation organized for charitable purposes had issued capital stock, are *In re Centennial & Memorial Assn.*, 235 Pa. 206 (83 Atl. 683), and in *Donohugh's Appeal*, 86 Pa. 306.   In the first case cited, a corporation had been incorporated to purchase, improve and preserve lands occupied by General Washington at Valley Forge, as a memorial park for all time to come.   Certificates of stock had been issued to individuals for moneys contributed to aid the corporation in carrying out the purposes for which it had been incorporated.   The corporation was dissolved by decree and by a subsequent decree commissioners were appointed to carry out the objects and purposes of the charitable use for which the property of the dissolved corporation had been held in accordance with the trust declared in its charter.   Referring to these stock certificates, the court said:

"While the certificates issued were called 'stock,' they lacked its essential features, except that the holders were entitled to elect directors, * * .   A

share of stock is an incorporeal, intangible thing. It is a right to a certain proportion of the capital stock of a corporation never realized except upon the dissolution and winding up of the corporation, with the right to receive, in the meantime, such profits as may be made and declared in the shape of dividends. The so-called stock in this case had none of these attributes. * * On dissolution the property of a charitable association does not revert to the donors, nor may it be divided among the members of the association, but it should be appropriated to the purposes most nearly akin to the intent of the donors under the direction of the court.''

In the latter case the complainant was a corporation organized for charitable purposes that had issued stock. It had been founded by Benjamin Franklin and others to maintain a public library. It sued for an injunction to restrain the tax collector from levying and collecting a tax on its library and library buildings. Referring to the interests of the stockholders of the corporation, the court said:

''The library is a trust, and while it is the property of the corporation, and therefore in a certain sense of the corporate stockholders, yet it is not their property in any full, legal or commercial sense. They cannot sell it and divide the proceeds among themselves as individuals—that would be a violation of the trust, which a court of equity would be bound at once to restrain.''

7, 8. A corporation is purely a creature of statute. It can exercise no power unless the statute expressly or by necessary implication authorizes it. Without such statutory power a corporation cannot have or issue capital stock. In this state corporations organized for profit are required by statute to have capital stock in order to enable them to carry out the objects and purposes for which they are organ-

ized, but corporations organized for charitable purposes are not authorized or permitted by statute to have or to issue capital stock. The E. Henry Wemme Endowment Fund is an eleemosynary corporation and the statute did not confer the power for it to have or to issue capital stock. The issuance by it of capital stock, although directed by the testator, was unauthorized by law and was wholly unnecessary to aid in carrying out the purposes of the charity. The stock, therefore, neither had, nor was a representative of, value. Therefore the mere transfer of the stock, in itself alone, could not confer upon the defendant churches anything more than a mere visitorial power over the charity. The E. Henry Wemme Endowment Fund was incorporated for the sole purpose of perpetually dispensing the bounty of E. Henry Wemme, the founder of the charity, for the benefit of the persons for whom he had created the charity. The purpose for which this corporation was formed and the property donated to it was to create and support a particular public charity. A public charity is always a favorite of the law, as it tends to relieve the public of a public burden. The E. Henry Wemme Endowment Fund holds the legal title to the property, as trustee for the beneficiaries of the charity. The property of the corporation is impressed with the trust and, in the nature of things, cannot become the subject of beneficial private ownership in the defendant churches, as this property must always be applied to the particular charitable use for which it was donated by the testator.

The churches contend that the testator intended to confer upon them the power, at will, to discontinue the charity, dissolve the corporation and distribute its assets among themselves. If this is true, it is

difficult to comprehend what object the testator could have had in directing that the corporation, to which the property was to be conveyed, should bear his name and exist as a corporation forever.  As the founder of a particular charity that would perpetually distribute his alms and bounty to the beneficiaries for whom he was donating his property, it is reasonable to suppose that he intended to perpetuate his name as the founder thereof; but if he intended that at the end of three years after his death the charity might be discontinued and the corporation dissolved, it is difficult to understand why the testator should desire that the corporation should bear his name or why he should expressly provide that the duration of the corporation should be perpetual.  We think it clearly appears from the words of the will that the testator intended that the charity he was founding should be perpetual and that in order to accomplish that purpose he expressly directed that the duration of the E. Henry Wemme Endowment Fund should be perpetual.  In express terms he prescribed the powers that the corporation could exercise, and among the powers so prescribed, he gave to the corporation no power to do any act or thing not essential to the perpetual maintenance and support of the charity. Without exercising other powers than those prescribed, the E. Henry Wemme Endowment Fund could neither sell nor dispose of the devised property nor apply the rents, issues and profits thereof for any purpose except to support and maintain the maternity home.  He therefore placed it beyond the power of the corporation to discontinue the charity or to apply the proceeds of the devised property to any purpose except the maintenance and support of the particular charity he provided for in the will.

Having devised his property in trust to three trustees, and having commanded them to convey the legal title to the devised property to the corporation without conditions or reservations of any kind, upon compliance with these instructions the legal title to the devised property would become vested in the corporation as soon as the conveyance was made and his power to further dispose of the property, except through the corporation itself, would be at an end. Having provided by the will the objects and purposes for which the corporation was to be formed and the powers that it should exercise, and not having given to it the power to sell or dispose of the property or to use the proceeds therefrom for any purpose except to maintain and support a particular specific charity, upon the formation of a corporation in compliance with these directions and the conveyance of the property to it, the legal title to the property became vested irrevocably in the corporation for a particular charitable use, nothing further was necessary to be done except to provide legal visitors for the charity to see that it was administered according to law. To confer this visitorial power upon the churches, we think, was the sole purpose of the testator in providing that the corporation should have capital stock and that the stock should be transferred to the defendant churches three years after his death, when, if his directions were complied with, the charity itself would be established and in operation.

In founding this charity the testator knew that it was necessary for the visitorial power to reside in someone. He knew that in the nature of things the three trustees named in the will could exercise the power for a limited time only. It appears that his heirs were, for the most part, residents of Germany,

and he could not reasonably expect that through them the visitorial power would be adequately exercised. In casting about for someone to perform this duty he selected the defendant churches, having, as he said, implicit faith and confidence in them and believing that they would be perpetual.

Had the testator intended to make a gift to the churches of the devised property it would have been wholly unimportant to him whether these churches would exist perpetually or not, and he would have had no reason to express any trust or confidence in them, for he knew that if the property was given to them they would use it for church purposes only. But because of his implicit faith and confidence in them, and of his belief that the churches would exist forever, and therefore be always capable of supervising and controlling the dispensation of the charity he was founding, he selected them as the legal visitors to see that the charity should be administered according to the purposes for which he donated his property.

If the testator had intended to give a beneficial interest in the corporate property instead of conferring a mere visitorial power over the corporation, it is reasonable to suppose that he would not have directed a corporation to be formed or an encumbrance to be placed upon the property or a particular charity to be established or have deferred the consummation of the gift for three years after his death, during which time an expenditure of $75,000 was to be made in establishing a charity which would be just as essential after as before the end of three years, but that he would have made an absolute and immediate gift, vesting the unencumbered title to the property in the churches at once. In fact if the con-

tentions of the defendant churches could be sustained, it would defeat the entire well-considered plan and scheme of the testator to create a particular charity which obviously, from the words used in the will, was his sole object and purpose in making the devise of the trust property.

9. In prescribing the terms and conditions under which the corporation should be formed, the powers it should have and exercise, the charitable use it should make of the devised property and the income therefrom, the testator was dealing with his own property, and it was his right to prescribe every condition controlling its disposition and the charitable uses to be made of it. The E. Henry Wemme Endowment Fund was incorporated and organized by legislative authority and the state has granted it the right of perpetual existence as a corporation. This franchise granted by the state to exist perpetually as a corporation cannot be taken away by the state except for just cause. Much less ought a trustee, charged with the conduct of the charity, be permitted to do so.

"Individuals," said Mr. Chief Justice MARSHALL, "have a right to use their own property for purposes of benevolence, either toward the public or toward other individuals. They have a right to exercise this benevolence in such lawful manner as they may choose; and when the government has induced and excited it by contracting to give perpetuity to the stipulated manner of exercising it, to rescind this contract and seize on the property is not law but violence. Whether the state will grant these franchises and under what conditions it will grant them, it decides for itself, but when once granted, the Constitution holds them to be sacred until forfeited for

just cause." *Dartmouth College* v. *Woodward*, 17 U. S. 518, 573 (4 L. Ed. 629, see, also, Rose's U. S. Notes).

But notwithstanding these considerations, the churches contend that, by the provisions contained in the last two paragraphs of that part of the will quoted above, in directing the trustees to transfer all of the capital stock of the E. Henry Wemme Endowment Fund to them, accompanied by the declaration of the testator that this stock was to be theirs forever for their own respective uses and benefit, and without any charge or trust reserved to his estate, and by his subsequent declaration that he had given absolutely and without reservation all of the stock of the corporation to the churches, the testator intended to give to the churches the full beneficial equitable title to all of the property of the E. Henry Wemme Endowment Fund and that the precatory words accompanying these declarations were not sufficient in themselves to create a trust upon the property in the hands of the churches, and therefore upon the transfer of the stock, the churches became the absolute owners of all of the property and assets of the corporation, and as the churches are organized for the advancement of religion, their ownership and enjoyment of the property will not divest it of the charitable uses intended by the testator.

At the time the transfer of the stock to the churches was to be made under the will, by its terms the legal title to the devised property was to be vested in the E. Henry Wemme Endowment Fund and the full beneficial ownership of the property was to be vested in the beneficiaries designated in the will. These beneficiaries, by the terms of the will, consisted of those unfortunate and wayward girls who were in

need of the accommodation, care, treatment and comfort, without cost or charge to them, of a maternity home or lying-in hospital, irrespective of their religion or nationality. As the legal title to the devised property was in the corporation, and the real beneficial ownership of the property of the corporation was in those persons who were the objects of the charity, the property of the corporation was held in trust by the corporation for the benefit of those for whom the charity had been created and the transfer of its stock could not have divested these beneficiaries of their beneficial ownership in the trust property, even if the corporation itself had been a corporation organized for profit, as the transfer of the stock of any kind of a corporation, commercial, charitable or otherwise, cannot in itself operate to the slightest extent in affecting the beneficial ownership of any property that the corporation, at the time, may hold in trust.

In collecting the intention of the testator from the words of the will, regard must be had to the nature and character of the property which the testator is attempting to dispose of. It is certain that, in disposing of the stock of the E. Henry Wemme Endowment Fund, the testator knew that by the terms of his will he had devoted the property of the corporation exclusively to charitable uses and that a transfer of the stock could not in any way affect the uses to which the property of the corporation was devoted. Knowing this as he did, it is idle to contend that in directing the trustees to transfer the stock to the defendant churches he intended in any way to change or affect the charitable uses for which he had devised his property. He also knew that by the terms of his will he was directing the trustees to provide in the

articles of incorporation of the E. Henry Wemme Endowment Fund that the corporation should be formed and organized for the exclusive purpose of "buying, owning, holding, managing, improving, mortgaging and leasing the real property hereinbefore devised to my trustees, and for the purpose of conducting a maternity home or lying-in hospital for unfortunate or wayward girls in the City of Portland, Multnomah County and State of Oregon." Knowing this, he was bound to know that the corporation must confine its operations to carrying out the objects and purposes stated in its articles of incorporation. He was also bound to know that when his property, under the directions of the will, had been devoted exclusively to a particular charitable use and no provision had been made for any part of it to be applied to any other use, the use of it for the particular charity provided for, unless the objects of the charity failed, would be perpetual, and this would exclude the property, or any part thereof, from being devoted to the church purposes of the defendant churches, no matter how laudable or commendable those purposes might be.

Knowing these things, he must have known that if the legal title to the property had become vested in the E. Henry Wemme Endowment Fund and that corporation had been incorporated according to his directions, he could neither confer upon his heirs nor any other person, that he might appoint, any power over the corporation or over the charity, except a visitorial power over the corporation to see that those in charge of it administered the charity according to law.

Considering the last two paragraphs of the will and giving proper regard to the nature and character

of the stock he was disposing of, it is evident that the testator did not intend to confer any beneficial interest in the defendant churches, but that the testator only intended to confer upon the churches a visitorial power over the charity, which charity he provided should be established before the transfer of the stock was made. But notwithstanding this, we are of the opinion that the precatory words contained in the last two paragraphs of the will were so used by the testator that they ought, in connection with their context, to be construed as imperative, that is, as creating an obligation upon the churches to maintain the particular charity provided for by the testator in the will.

10, 11. In order to raise a precatory trust, it is necessary that there be a gift of property to one person for the benefit of another. Precatory words are words of recommendation, entreaty or the like, accompanying a gift and implying a desire or wish on the part of the donor that the property given should be used for the benefit of some designated person or be applied to some designated purpose. Precatory words are not imperative in form as that would result in a contradiction in terms. They are words of recommendation, entreaty or wish, and it is sufficient to make them imperative if it appears that they were intended to create an obligation.

The doctrine of precatory trusts was announced by Lord LANGDALE in *Knight* v. *Knight*, 3 Beav. 148, in these words:

"As a general rule, it has been laid down that when property is given absolutely to any person, and the same person is, by the giver who has power to command, recommended, or entreated, or wished to dispose of that property in favor of another, the

recommendation, or entreaty, or wish shall be held to create a trust: 1. If the words are so used that, upon the whole, they ought to be construed as imperative; 2. If the subject of the recommendation or wish be certain; 3. If the objects or persons intended to have the benefit of the recommendation or wish be also certain."

The third subdivision quoted is not applicable to a charity, because the objects of a charity are always indefinite and uncertain.

In the will here the testator accompanied the gift of the stock by declaring: "I hope, however, this is not directory, but merely a suggestion that the maternity home constructed as hereinbefore provided shall be continued by said corporation, E. Henry Wemme Endowment Fund, perpetually and forever, but I do not make this binding upon said Church of Christ, Science, or upon said E. Henry Wemme Endowment Fund, a corporation, for the reason that I have implicit faith and confidence in the Church of Christ, Science, and believe that they will be perpetual and I realize the inability of one now living to determine what in the future might be the greatest need and benefit to suffering humanity, and therefore I have given absolutely and without reservation all of the stock of said corporation of said E. Henry Wemme Endowment Fund, to said Church of Christ, Science believing that they will expend the rents, issues and profits and all the proceeds of the said E. Henry Wemme Endowment Fund in a manner so as to create the greatest relief for the greatest number of suffering humanity."

12, 13. We think that this last paragraph of the will, couched, as it is, in words of recommendation, was intended by the testator to impose an obligation

upon the part of the churches to maintain the maternity home, and that the testator intended to confer upon the churches a visitorial power only, except the power to change the form of the charity at some future time if it should develop that another form of charity would be more beneficial to a greater number of persons than the one established by him.

That the testator did not intend that the objects of the new charity should be the churches themselves is clear because if that had been his intention he would have stated so in apt terms, and that the testator intended that the change should not be made in the immediate future is apparent from his statement that he realized that one now living could not foresee a change of conditions which might occur in the world's history, whereby another form of charity would be more beneficial to suffering humanity than the one founded by him.

We think, by the use of these precatory words, the testator intended to impose an absolute liability upon the churches to maintain the maternity home until some time when that form of charity would be less beneficial to humanity than some other form. That that contingency has not yet arisen appears from the fact that the defendant churches make no defense upon that ground, but base their right to make the change wholly upon the fact that they cannot administer the trust in operating the maternity home without violating the religious convictions of the members of their own churches. Clearly, this is not the contingency contemplated by the testator, upon the happening of which the churches were to have the power to change the particular charity for another. But if the contingency had occurred by reason of the objects of the charity founded by the testator failing, we do not

understand that the churches themselves, upon their own motion, could make the change without first applying to a court of competent jurisdiction and securing a decree directing that the change should be made.

Whether the purposes of the testator in providing for the substitution of some other form of charity, which, at some future age, may be of greater benefit to a greater number of suffering humanity, are void, because so vague and uncertain, or whether morality will ever so universally prevail that it will render this particular form of charity unnecessary, are matters with which we are not now concerned. If those conditions should ever prevail, there are well-established rules by which the charitable uses, for which the testator devised the property, can be executed.

It is no answer for the defendant churches to say that, because the particular charity for which the testator provided is now being conducted and carried on by the Salvation Army upon the site purchased by the trustees for the maternity home, the necessity for the particular charity provided for by the testator no longer exists. The purpose for which the testator devised his property was to have the E. Henry Wemme Endowment Fund carry on this particular charity. The Salvation Army are under no obligations, arising through the will, to conduct and maintain a maternity home, and they may discontinue the same at will.

The defendant churches, believing that the transfer of the stock, pursuant to the provisions of the will, operated to vest in them the title to the property of the corporation as a consummated gift, discontinued the charity which the testator, as donor, intended

should be perpetual, and have since treated the trust property as their own absolute property. While unquestionably in good faith, the defendant churches believed that the transfer of the stock to them vested in them the title to the trust property, it did not have that effect, because it is clear that the testator did not so intend.

It is conceded by the churches that because of the doctrines and teachings of the Church of Christ, Scientist, the churches themselves cannot, without violating the religious convictions and beliefs of their own members, maintain and operate the maternity home according to the laws of this state. That there are unfortunate and wayward girls requiring the aid of such an institution is not disputed. As the objects of the charity have not failed but the trustees themselves have, it is the duty of the court to appoint other trustees to conduct that particular charity and to administer the trust according to the directions of the donor.

14, 15. It is a well recognized principle of equity that a trust estate must bear the necessary expenses of its administration. The attorneys representing the parties opposed to the defendant churches have performed services for which they are entitled to receive a reasonable compensation. In *Trustees* v. *Greenough,* 105 U. S. 527, 532 (26 L. Ed. 1157, see, also, Rose's U. S. Notes), that court said:

"It is a general principle that a trust estate must bear the expenses of its administration. It is also established by sufficient authority, that where one of many parties having a common interest in a trust fund, at his own expense takes proper proceedings to save it from destruction and to restore it to the purposes of the trust, he is entitled to reimbursement

either out of the fund itself, or by proportional contribution from those who accept the benefit of his efforts.   This has long been the rule in relation to proceedings for restoring property to the uses of a charity, which has been unjustly diverted therefrom. Thus, in *Attorney-General* v. *The Brewers' Company* (1 P. W. 376), Lord Chancellor Cowper allowed costs to the relators out of the improved rents which they received for the charity, 'for that they had been serviceable to the charity, by easing them of the six hundred and twenty pounds debt which was claimed against them.'   In *Attorney-General* v. *Kerr*, (4 Beav. 297), it is conceded to be the general rule that the relator in a charity information, upon obtaining a decree, is entitled to his costs as between solicitor and client.   In that case they were not allowed out of the general charity estate, but were charged upon the particular property recovered.   The same rule was followed in *Attorney-General* v. *Old South Society,* 13 Allen (Mass.), 474.''

For these reasons the decree of the lower court will be reversed and the cause will be remanded to that court with directions to appoint not less than three nor more than five competent and qualified trustees to take over all of the property of the E. Henry Wemme Endowment Fund and to administer the trust and to require the defendant churches to account for all moneys and properties belonging to the E. Henry Wemme Endowment Fund that have come into their hands or possession, and to deliver and pay over the same to said trustees so to be appointed, and to ascertain and determine the reasonable compensation which should be paid to the attorneys representing parties in opposition to said churches for their services performed by them in this suit, and to cause the same to be paid from the trust estate, and for

such other and further proceedings as are not inconsistent herewith.

> REVERSED AND REMANDED, WITH DIRECTIONS, REHEARING DENIED. MOTION TO REOPEN DENIED. MOTION RE ATTORNEY'S FEES DENIED.

BURNETT, J., not sitting.

---

Motion to recall mandate denied February 26, 1924.

ON MOTION TO RECALL MANDATE.

(223 Pac. 250.)

MOTION DENIED.

For the motion, *Mr. Harrison Allen, Mr. A. C. Spencer* and *Mr. Isham N. Smith.*

McCOURT, J.—Claiming to be entitled to attorney's fees out of the trust fund which is the subject of this litigation, W. P. La Roche, an attorney of this court, has applied for an order directing that the mandate heretofore issued herein be recalled and amended or modified so as to authorize the allowance of such attorney's fees.

After this suit was commenced, it came to the attention of the Attorney General that the funds and property involved in the litigation belonged to a public charity. Thereupon the Attorney General determined to intervene in the suit for the purpose of defeating the private rights asserted therein and in order to protect and preserve the charity in the interest of the public. The Attorney General authorized Mr. La Roche, the claimant herein, to make such

intervention in behalf of the Attorney General and the State of Oregon, and to prosecute and conduct the litigation in the name of the Attorney General.

Pursuant to the authority mentioned, Mr. La Roche, as special attorney for the State of Oregon and for and in the name of the Attorney General, filed an answer of intervention in the suit, and in the subsequent proceedings herein, acted in behalf of the Attorney General until a final decree was entered in this court: *Wemme et al.* v. *First Church of Christ, Scientist, ante,* p. 179, 219 Pac. 618.

After the decision herein, but before the mandate sought to be recalled and modified was issued, the Attorney General, by written disclaimer, filed in this court, expressly renounced all claim and right to attorney's fees in the cause or in the further proceedings to be had in connection therewith, and specially waived and disclaimed the allowance of such fees to him.

The decree and mandate of this court contains the following provision:

" * * no compensation as attorney's fees shall be allowed, either directly or indirectly, for services performed by the Attorney General or his assistants in this cause."

In an affidavit accompanying his motion to recall and modify the mandate, Mr. La Roche states that he was duly employed and authorized by the Attorney General to represent the public interests as his attorney in said cause, with the understanding that affiant should look to the trust fund for his compensation for legal services, in the event that the contentions of the Attorney General were sustained by this court. The affidavit further states that all the legal work done and performed in behalf of the Attorney

General was done by affiant, without aid or assistance from the Attorney General or any of his deputies or assistants.

The intervention of the Attorney General in the suit resulted in the enforcement of the public charity involved therein. That intervention was made and carried to a successful conclusion by Mr. La Roche; the services performed by him were valuable to the charity, and the funds belonging thereto, and they were rendered pursuant to such authority from the Attorney General as in the circumstances that officer was empowered to confer upon Mr. La Roche.

16. The statutes clearly prohibit compensation to the Attorney General out of the fund, and no authority is found in the rules of equity practice which warrants such an allowance to the Attorney General. While allowances for attorneys' fees out of the fund in the control of a court of equity are sometimes made directly to the attorneys themselves, the right of such attorneys thereto in every such case is dependent upon the right of their client to such fees: *Schmidt* v. *Oregon Min. Co.*, 28 Or. 9, 30 (40 Pac. 406, 1014, 52 Am. St. Rep. 759). If the client is not entitled to costs, including attorney's fees, out of the fund, no allowance can be made directly to the attorney.

The foregoing considerations led to the decree herein, denying attorney's fees to Mr. La Roche.

In view of the earnest insistence of Mr. La Roche, and counsel representing him upon his motion, we have again examined the statutes and decisions bearing upon the question.

17. The office of Attorney General in this state is created by statute, and the powers and authority of the incumbent of that office are those conferred upon

him by the statute, and no others: *Hord* v. *State,* 167 Ind. 622 (79 N. E. 916); *Julian* v. *State,* 122 Ind. 68 (23 N. E. 690).  No specific provision of the statutes grants authority to the Attorney General, or makes it his duty to appear and represent the state in suits or proceedings relating to a public charity: Sections 2769–2779, Or. L.; Laws 1921, p. 477.

However, the statute does provide that—

"He shall be the law officer of the state, and shall have all the power and authority usually appertaining to such office."  Section 2773, Or. L.

The above provision imposes upon the Attorney General the powers and authority incident to that office at common law.  Among the duties of the Attorney General at common law was that of enforcing a public charity: *State ex rel* v. *Lord,* 28 Or. 498, 527 (43 Pac. 471, 31 L. R. A. 473); *Parker* v. *May,* 5 Cush. (Mass.) 336; *People* v. *Miner,* 2 Lans. (N. Y.) 397; 6 C. J. 814.

The compensation of the Attorney General is fixed by the statute.  The express authority granted the Attorney General to appoint or employ attorneys to assist him in the performance of his duties is confined to the appointment of a first assistant and such other assistants as he shall deem necessary to transact the business of the office, at annual salaries to be fixed in each instance by the Attorney General at the time of making the appointment.  The salaries of the Attorney General and the assistants appointed by him are required to be paid out of the state treasury as other state salaries are paid: Chap. 251, Laws 1921.

Another section of the statute declares in effect that the salaries mentioned shall be in lieu of all other salaries, fees, commissions and emoluments now

received or enjoyed by the Attorney General or any of his assistants, and directs that moneys collected by any such officer, or by virtue of his office, shall be paid into the state treasury: Section 2978, Or. L. Manifestly, those statutes prohibit an allowance of attorney's fees out of the trust fund in question to the Attorney General or any of his assistants appointed pursuant to the statute.

Numerous cases hold that at common law, the Attorney General had power to give jurisdiction to the courts and to bind himself as a party representing the public in the ordinary way through an unofficial attorney at law, authorized to represent him: 6 C. J. 806; 2 R. C. L. 916; *Parker* v. *May*, 5 Cush. (Mass.) 336, 338; *In re Creighton*, 91 Neb. 654 (136 N. W. 1001, Ann. Cas. 1913D, 128); and it is also held that such power is not limited by statutes giving the Attorney General authority to appoint such assistants as the duties of the office may require, whose salaries shall be paid out of the state treasury: *Commonwealth* v. *Boston etc. R. Co.*, 3 Cush. (Mass.) 25, 48; *Commonwealth* v. *Knapp*, 10 Pick. (Mass.) 477 (20 Am. Dec. 534); *McQuesten* v. *Attorney General*, 187 Mass. 185, 186 (72 N. E. 962); *Attorney General* v. *North American L. Ins. Co.*, 91 N. Y. 57, 66 (43 Am. Rep. 648).

None of the cases above cited, except the last, discuss the question of compensation to special counsel designated by the Attorney General to represent him, payable out of a fund in litigation. In the New York case, the right of special counsel to an allowance of attorney's fees out of the fund was denied.

"Unless authorized by statute, an attorney-general has no authority to appoint special counsel to act generally for him in actions or proceedings in which

the state is interested, so as to charge the state with the value of their services." 6 C. J. 806 and cases cited in note 21.

No authority can be found in the decisions of the courts or in any statute which authorizes the Attorney General to employ special counsel and charge a fund in litigation with payment of their services.

"In the absence of specific authority such funds cannot be ordered by the court to be paid for any purpose, except by express authority of the legislature." *People* v. *Woodbury,* 213 N. Y. 51, 59 (106 N. E. 932).

Counsel for Mr. La Roche, in their brief in support of his claim to compensation out of the fund in suit, cite: *Currie* v. *Pye,* 17 Ves. 462; *Attorney General* v. *Wallace's Devisees,* 7 B. Mon (Ky.) 611; *Attorney General* v. *Old South Society,* 95 Mass. 474.

In each of those cases, except *Currie* v. *Pye,* a private individual having a special interest in preserving a public charity, appeared as relator, employed private counsel and carried on the litigation.

*Currie* v. *Pye* was a suit commenced by trustees against the heir, for the construction of a will creating a charity. Costs were allowed the heir as between attorney and client. The Lord Chancellor observed, "that it was frequently done in a charity cause: the heir not having made an improper point."

*Attorney General* v. *Wallace's Devisees* was a suit instituted in the name of the Attorney General by W. H. Cord, as relator, praying to have enforced and executed a charitable devise in the will. On the question of costs, the court said:

"The court should provide for the payment of all costs necessarily incurred by the relator in this proceeding, and also a reasonable compensation for his

services, to be paid by the trustees out of the trust fund.''

*Attorney General* v. *Old South Society* was a suit commenced by an information filed by the Attorney General upon the relation of Joseph Ballard, charging that certain funds belonging to a charitable trust were being wholly misapplied and perverted, and praying for relief in equity. In awarding costs, the court said:

''As the intermingling by the defendants of the fund of the charity with other funds has afforded ground for this information, and the information is sustained in part, the costs incurred in support of it, taxed as between counsel and client, are to be paid out of the charity fund.''

In the case of *Trustees* v. *Greenough*, 105 U. S. 527 (26 L. Ed. 1157) (Attorney General not party thereto), the court, explaining the phrase, ''costs as between solicitor and client,'' which has the same meaning as ''costs as between attorney and client'' and ''costs as between counsel and client,'' said:

''Of course, it is well understood that costs as between solicitor and client include all reasonable expenses and counsel fees, and are not like costs as between party and party, confined to the taxed costs allowed by the fee-bill. This difference is pointed out in the case of *In re Paschal*, 10 Wall. 483, 493 (19 L. Ed. 992).''

In allowing costs, including attorney's fees, to the relator, payable out of the fund, the courts in each of the foregoing cases, followed the leading case of *Attorney General* v. *Kerr*, 4 Bev. 297, where the practice in the Court of Chancery of England in such cases was reviewed. In that case, objection was made to the claim of the relator for costs, including solicitor's fees, out of the funds of the charity. In

passing upon the objection, the Master of the Rolls said:

"We are all aware of the great abuse which has been practiced in these charity informations for many years past. In some cases, no doubt, they have been productive of considerable good; but in many, they have ended in the entire ruin of the charities they professed to protect. * *

"It appears to me, that the practice of making any such allowance is of very recent origin, and that it is not a matter of course to make it. * *

"Sir John Leach, indeed, seems to have thought, that a relator was to be considered in some sense in the situation of a trustee; and there are several cases in which he allowed the relator his costs as between solicitor and client, and these cases are of themselves sufficient to show that there was no general rule to allow costs, charges, and expenses. * *

"On considering the cases which have occurred, it appears that the relator in a charity information, where there is nothing to impeach the propriety of the suit, and no special circumstances to justify a special order, is, upon obtaining a decree for the charity, entitled to his costs as between solicitor and client * * out of the charity estate."

The practice of the Court of Chancery in England in granting costs was ably reviewed by the Court of Appeals of New York in the cases of *Rose* v. *Rose Assn.*, 28 N. Y. 184, and *Downing* v. *Marshall*, 37 N. Y. 380. The practice of awarding costs, including solicitor's fees to the relator out of the fund in cases relating to charitable trusts, probably originated in the notion alluded to in *Attorney General* v. *Kerr,* "that a relator was to be considered in some sense in the situation of a trustee," for at one time it was the rule in such cases that only trustees were entitled to such reasonable counsel fees payable from the fund

as they had incurred in defending or enforcing the charity: *Rose* v. *Rose Assn., supra.*

The right of the Attorney General to costs, as between party and party, out of a charity fund, is supported by authority (*Attorney General* v. *Ashburnham,* 1 Sim. & St. Rep. 394), but diligent search has failed to reveal any adjudicated case, either in England or the United States, holding the Attorney General, or special counsel authorized to appear for him, entitled to attorney's or solicitor's fees out of funds belonging to a public charity which was the subject of the litigation.

It is incorrectly stated in Beames on Costs, page 15, that *Moggridge* v. *Thackwell,* 7 Ves. 36, is a case concerning a charitable trust, in which costs as between solicitor and client were allowed out of the fund to all the parties, including the Attorney General.

The case, as reported in 7 Ves. 36, came before Lord Chancellor Eldon on rehearing, and he adhered to the decision and decree, including the order for costs, given by Lord Chancellor Thurlaw, his predecessor: 1 Ves. 464.

The reports of the case show that it was a suit commenced by the executors against the legatees in the will, to obtain a decree construing a provision of the will, whereby the testator had attempted to found a charity. The Attorney General was not a party to the record, and no reference is made to him in the order for costs, which was in these words: "Let all parties have costs out of the estate, and as between attorney and client, since it is a cause between relations." 1 Ves. 464, 475.

In view of the large number of cases that have arisen concerning funds belonging to public charities,

the absence of an allowance in any of them of counsel fees out of the fund, to the Attorney General or his representatives, is a strong argument against the power or authority of a court of equity to impose a charge of that character upon such a fund.

The principles governing the decision of the question under consideration were clearly stated by the New York Court of Appeals in *Attorney General* v. *Continental Life Ins. Co.*, 88 N. Y. 571. A statute of that state, adopted in 1880, made it the duty of the Attorney General, in the case of the insolvency of a life insurance corporation, to obtain the appointment of a receiver and to supervise the liquidation and distribution of the assets in the interest of policyholders and creditors. The Attorney General designated special counsel to act for him, who claimed the right to attorney's fees out of the fund. Mr. Chief Justice ANDREWS, speaking for the court, said:

"It is inconsistent with the duty imposed by the act of 1880, that the attorney-general should be placed in the attitude of applying to the court for allowances to his own assistants. The State intervenes, as *parens patriae*, for the protection of the fund, and those beneficially interested, and it is not consistent with its dignity, nor was it, we think, contemplated, that the value of the services of its agents in the execution of this voluntary trust, should be a charge upon the assets of the insolvent corporation. We are not insensible to the consideration that the act of 1880, imposes onerous duties upon the attorney-general, and that adequate assistance may not have been provided to enable him to perform this additional labor. It would be greatly to be regretted if this decision should hamper the action of the attorney-general under this salutary statute. The legislature, however, can afford such relief as may be necessary. But to permit the State to participate in the division of the assets of insolvent corporations in the hands

of a receiver, under a claim for discretionary allowances, or to charge the fund for services of special counsel of the State, is, we think, contrary to principle and to the policy of our legislation.''

From the foregoing review of the authorities, it is seen that the right to an allowance such as that asserted upon the motion under consideration has not been recognized in any jurisdiction; and the great array of decisions, in none of which such an allowance was made, though frequent occasion must have arisen for doing so, argues strongly against the policy and propriety of awarding counsel fees out of a fund in court to the Attorney General or his representative in any case. To allow the motion would arbitrarily extend the scope of firmly established rules of equity practice, the utmost limitations of which were long since fixed by authoritative adjudications. We are not inclined to do this, and accordingly the motion is denied.                                   MOTION DENIED.

BURNETT and COSHOW, JJ., took no part in this decision.