Argued January 10, affirmed March 19, 1929.

IN RE ESTATE OF T. T. PRICKETT, DECEASED.

NANCY ANN DEVAULT *v.* M. J. PRICKETT ET AL.

(275 Pac. 605.)

For appellant there was a brief over the name of *Mr. Emerson U. Sims* with an oral argument by *Mr. W. O. Sims.*

For respondent there was a brief over the name of *Messrs. Veazie & Veazie* with an oral argument by *Mr. A. L. Veazie.*

RAND, J.—T. T. Prickett died on June 27, 1926, leaving a last will and testament which had been executed on June 21, 1926. He left surviving him one brother and one sister as his next of kin and sole heirs at law. Nancy Ann Devault, the sister, instituted these proceedings to contest the validity of the will and to have the order admitting it to probate set aside and annulled, alleging as the grounds therefor, (1) that the testator did not have testamentary capacity to make a will, and, (2) that the will was procured by undue influence. Upon the trial she was permitted to amend her petition and to allege that the will was void for uncertainty. From a decree in favor of the will, she has appealed, contending that the will should have been rejected upon each of said grounds.

1, 2. On its face, the will shows that it was executed with all the formalities required by law. By its terms, the testator gave and bequeathed to his said brother and sister the sum of $3,000 each and to his stepson, J. D. Stoltz, the sum of $1,000. To Mrs. Josephine Stapleton, he gave, bequeathed and devised an annuity of $150 per month for the remainder of her life and also the house in which he had been living and the furnishings therein. The rest, residue and remainder of his property he gave and devised to a corporation known as the Portland Community Chest, and directed that, after it had been converted into money, it should "be expended by said charitable corporation in such manner as it may deem advisable for the relief of young people in the city of Portland, who are and who may become in need of charitable assistance."

At the time of the execution of the will, testator was eighty-three years of age and was suffering from an illness which resulted in his death six days thereafter. He had been, for several years, suffering from the effects of a partial stroke of paralysis from which he seems to have recovered for the evidence shows that he was able to walk and work in his garden until a few days before the will was made. Contestant was several years older than testator and testator's brother was also of an advanced age. Both of them resided in West Virginia, while testator had lived in Portland for many years and, up to about ten years before his death, he had worked for the Oregon-Washington Railroad & Navigation Company in the capacity of a bridge foreman. The evidence shows that he was industrious and thrifty and he had accumulated property which was of the appraised value of $97,000. For some time prior to his death, testator had been intending to make a will. He consulted with Mr. Clarence H. Gilbert, who was then practicing law in Portland and who is now one of the judges of the Circuit Court for Multnomah County. Prior to that Mr. Gilbert had transacted more or less legal business for testator for several years. He informed Mr. Gilbert that his brother and sister were old and had sufficient for their needs, but that he wished to leave each of them the sum of $3,000. He told him that he wished to leave to Mrs. Stapleton, his housekeeper, a house and lot for a home and to provide for the payment of a sufficient amount per month to her to support her during the remainder of her life. She was at that time sixty-five years of age. Mr. Gilbert asked him if $100 per month would be a proper amount and he answered

that it would. For several weeks prior to the making of the will Mr. Gilbert had been engaged in the trial of a lawsuit and, while so engaged, testator sent word to him that he wanted him to come to his house and prepare his will. Mr. Gilbert went there four or five different evenings but found testator either asleep or too ill to make his will.

On Saturday, June 19th, testator, in a conversation with Mrs. Gill, a daughter of Mrs. Stapleton, inquired of her what lawyer she had employed in the settlement of her deceased husband's estate and she informed him that she had employed Mr. J. Hunt Hendrickson. He asked her if his services had been satisfactory and, upon her replying in the affirmative, he requested her to call him and have him come to the house and prepare his will. At the same time, he requested her to call Mr. B. F. Stevens and have him present at the time the will was prepared. Mr. Hendrickson is now one of the district judges for Multnomah County and is a lawyer of standing and integrity. Mr. Stevens for more than 40 years has been a trusted employee of the First National Bank of Portland, where testator deposited his money, and was a friend of the testator. They both came to his home in the afternoon of June 19th and at that time testator told them what property he had and what disposition he wished to be made of it. During their conversation with testator, neither Mrs. Gill nor Mrs. Stapleton was in the room. Testator told them he wanted to give to his brother and sister the sum of $3,000 each. He first said he did not want to leave anything to his stepson but finally stated that he wanted to leave him $1,000. He said Mrs. Stapleton had been very kind to him and that he had promised

her that when he died, if she would remain with him until he died, he would leave her enough so that she would not have to depend upon her labor for support after his death. He told them that he wished to leave her a house and lot, which is referred to in the testimony as the Vernon property, and to give her $30 per month as long as she lived. The rest of his property he said he wanted to give for charitable purposes. The Salvation Army was mentioned but the testator did not wish to give his property to the Salvation Army. He said he did not want to leave his property to old people, that they had had their chance in life, and that he wanted to help young people—help them get a start in life. After talking matters over with testator, both Mr. Stevens and Mr. Hendrickson left the house. Mr. Hendrickson returned to his office and drew a will upon the terms indicated by testator and at 5 o'clock that afternoon they both returned to testator's home where the will that had been prepared that afternoon was read to testator and then executed by him in their presence, each of them signing as attesting witnesses. During the evening of that day, Mrs. Gill called up Mr. Hendrickson and told him that testator was not satisfied with the payment to her mother of $30 per month, as provided for in the will, and he wanted Mr. Hendrickson to make the amount $60 per month. Thereupon, Mr. Hendrickson prepared a codicil, changing the amount from $30 to $60 per month and, with his wife, went to testator's home, read over to him the codicil, which testator then signed and it was attested by Mr. and Mrs. Hendrickson. On the following day, Sunday, Mrs. Gill again called Mr. Hendrickson and told him that testator thought that the

amount to be paid to her mother should be $100 per month instead of $60 per month. Rather than make an additional codicil, Mr. Hendrickson prepared a new will, providing that Mrs. Stapleton should be paid $100 per month and containing the other terms of the first will. With Mr. Stevens, Mr. Hendrickson went to testator's home and the new will was read to him. He then requested them to call Mrs. Stapleton, which they did, and then testator told them in the presence of Mrs. Stapleton that he had concluded to give her the home where he was then living instead of the Vernon property. She then left the room and testator stated to Mr. Hendrickson and Mr. Stevens that the house he was about to give to Mrs. Stapleton was expensive to heat, that the taxes on it were higher than on the Vernon property, that the roof needed to be repaired, and that the city was contemplating some change in the street which would require the payment of assessments, and that he did not believe that $100 per month would be sufficient to make these repairs, pay the taxes and assessments and to provide a living for her, and that he thought she should be paid $150 per month. Thereupon Mr. Hendrickson, in the presence of testator and Mr. Stevens, erased the description of the Vernon property and the amount of $100 per month in the typewritten will, as prepared, and inserted therein in ink the description of the home property and $150 per month as the amount to be paid to Mrs. Stapleton. After these changes had been made, the will was then read to testator and he assented to all of its provisions. Thereupon, he arose from the bed and signed the will and requested them to sign as witnesses, which they did. The original will was

then destroyed and the new will was delivered to Mr. Stevens, who took it to the First National Bank and retained it in his custody until after the death of the testator. Mr. Stevens was appointed as executor of the will.

We can find no evidence in the record to sustain the contention that the testator did not have mental capacity to make the will or that the will was procured by undue influence. While very sick and much enfeebled physically on June 21, 1926, his mind was clear and he understood exactly what disposition he desired to be made of his property. The only persons present at the time when the will was made were Mr. Hendrickson and Mr. Stevens and they both testified in detail to what was said and done at the time. He told them the names and address of his brother and sister. He said that they were both very old and had sufficient property of their own to provide for the short time they had to live. Notwithstanding that, he said he wanted to leave to each of them $3,000. He mentioned his stepson, the son of his deceased wife by her first marriage, and, for reasons not necessary to be here stated, he was at first opposed to leaving him anything but after considering the matter for a moment he decided to leave him $1,000. He mentioned the property he had and where it was. He told them what Mrs. Stapleton had done for him and the obligations that he felt he was under to her and, after talking matters over with them, he decided to give her the home property rather than the Vernon property and, because of the additional expense she would be put to in keeping up the house, repairing the roof, paying street assessments and higher taxes, and buying more fuel to heat

the house, he said she would need more than $100 per month to provide for such expenses and to maintain herself. For those reasons, he decided to give her an annuity of $150 per month. He said he wanted to leave the balance of his property to charity, that he wanted to help the young people, not old people who had had their chance in the world, and decided to give the balance of his property in trust for that purpose to the Portland Community Chest. These acts and statements of the testator were not the acts of a man incompetent to make a will but showed that the testator had more than the average intelligence and good memory and sound judgment at the time he made his will, and there is nothing in the record to contradict or dispute the testimony of either Mr. Hendrickson or of Mr. Stevens.

Nor is there anything in the record to show that Mrs. Stapleton or Mrs. Gill, or any other person, influenced the testator to the slightest extent in the making of his will or in the making of a suitable provision for Mrs. Stapleton. The appraised value of the house and lot was $5,000 and of the furnishings, $30, and the evidence shows that an annuity of $150 per month for Mrs. Stapleton could be purchased for about $19,000.

3. Contestants' next contention is that the gift of the property in trust to the Portland Community Chest to be expended for the relief of young people in the City of Portland, who are and who may become in need of charitable assistance, is void because those who may become its beneficiaries are uncertain or unknown. This contention may be answered by the language of Mr. Justice STRAHAN in *Raley* v. *Umatilla County,* 15 Or. 172 (13 Pac. 890, 3 Am. St.

Rep. 142), where a like contention was made and where the court said:

" * * It is also urged by counsel for appellants, with much apparent confidence, that this trust is void because those who may be its beneficiaries are uncertain or unknown. But this does not belong to that class of trusts where it is necessary they should be known. It is the use to which the property is to be applied and not the persons benefited which the law regards in such case. In other words, it is a trust for charitable uses. (2 Perry on Trusts, § 700.) 'If in a gift for private benefit, the *cestuis que trust* are so uncertain that they cannot be identified, or cannot come into court and claim the benefit conferred upon them, the gift will fail, and revert to the donor, his heirs or legal representatives. But if a gift is made for a public charitable purpose, it is immaterial that the trustee is uncertain or incapable of taking, or that the objects of the charity are uncertain or indefinite. Indeed, it is said that vagueness is in some respects essential to a good gift for a public charity, and that a public charity begins where uncertainty in the recipient begins.' (2 Perry on Trusts, § 687.) Trusts of this character have been generally favored and liberally construed by the courts."

To the same effect see *Pennoyer* v. *Wadhams,* 20 Or. 274 (25 Pac. 720, 11 L. R. A. 210), where the question was discussed in great detail by Mr. Justice BEAN. See, also, *Wemme* v. *First Church of Christ, Scientist,* 110 Or. 179 (219 Pac. 618, 223 Pac. 250), where the same doctrine was announced and followed.

Under the provisions of this will, we have a certain and definite class of persons with an ascertained mode of selecting them. It is, therefore, as said in 2 Perry on Trusts, Section 732,

"immaterial how uncertain, indefinite, and vague the *cestuis que trust* or final beneficiaries of a charitable

trust are, provided there is a legal mode of rendering them certain by means of trustees appointed or to be appointed. In other words, it is immaterial how uncertain beneficiaries or objects are, if the court, by a true construction of the instrument, has power to appoint trustees to exercise the discretion or power of making the beneficiaries as certain as the nature of the trust requires them to be. Uncertainty as to the individual beneficiaries is characteristic of a charitable use. If the class from which the selection is to be made is limited so that the court can distribute or enforce the trust in case the trustee refuses to act, that is the most that is ever required."

Finding no merit in any of the contentions urged, the decree of the lower court must be affirmed.

AFFIRMED.

COSHOW, C. J., and McBRIDE and ROSSMAN, JJ., concur.